THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

```
************************************
BRAD DAVIS                          *
Plaintiff                           *
                                    *
v.                                  *        Case # 3:24-cv-03058-K-BW
                                    *
                                    *        1st AMENDED COMPLAINT
                                    *
                                    *        JURY TRIAL DEMANDED
NEXT BRIDGE HYDROCARBONS            *
INC.,                               *
Defendant                           *
                                    *
JOHN BRDA                           *
Defendant                           *
                                    *
GREGORY MCCABE                      *
Defendant                           *
                                    *
FINANCIAL INDUSTRY                  *
REGULATORY AUTHORITY                *
Defendant                           *
                                    *
ROBERT W. COOK                      *
CEO FINRA                           *
Defendant                           *
                                    *
MERRICK GARLAND                     *
US ATTORNEY GENERAL                 *
UNITED STATES OF AMERICA            *
Defendant in his official capacity  *
                                    *
************************************
```

**<u>COMPLAINT</u>**


**<u>INTRODUCTION</u>**

This action is brought by Plaintiff Brad Davis to recover damages for violations of the Securities Exchange Act of 1934 (15 USCS 78a et seq.), the Sherman Antitrust Act (15 U.S.C. 1), with recovery for damages under the Clayton Act (15 USCS 15), and Texas state law claims.

Plaintiff also brings two actions within this lawsuit for Declaratory Judgment and Injunctive Relief under the Declaratory Judgment Act (28 USCS 2201) to find the Private Securities Litigation Reform Act of 1995 (15 USCS 78u-4) unconstitutional and to find Defendant Financial Industry Regulatory Authority unconstitutional and in violation of the Appointments Clause, *inter alia*. Diversity jurisdiction is also claimed under 13 USCS 1332. The amount in controversy is over $75,000. Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367. These Texas claims are Texas Sec. 4008.051 Offeror or Seller Liability: Registration and Related Violations and 4008.052 Offeror or Seller Liability: Untruth or Omission.

## **PARTIES**

1.    Plaintiff Brad Davis (hereinafter referred to either as "Plaintiff" or "Davis") has at all times mentioned herein been a resident and citizen of Fort Bend County Texas, with an address at 4771 Sweetwater Blvd. Sugar Land, TX. 77479.

2.    Defendant Next Bridge Hydrocarbons, Inc. (hereinafter "NBH") was formed as part of the corporate spin-off from Meta Materials, Inc., intended to provide MMTLP shareholders with private ownership of its oil and gas assets. NBH is a private oil and gas exploration, and development company incorporated in the State of Nevada with its principal place of business located at 500 W. Texas Ave., Suite 890, Midland, TX 79701.

3.     Defendant Greg McCabe (hereinafter "McCabe") is the CEO and Chairman of Next Bridge Hydrocarbons (NBH) and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701.

4.     Defendant John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources. His home address is 1425 Frontenay. Warson Woods, MO 63122.

5.     Defendant Financial Industry Regulatory Agency (hereinafter "FINRA") is a Securities and Exchange Commission "self-regulatory organization" charged with regulating the US financial markets. It is headquarters is at 1735 K Street NW, Washington, D.C., 20006. FINRA conducts business in Texas, has local offices in Dallas, conducts trainings of broker-dealers for approximately broker-dealers in Texas, is chartered by Congress to conduct business as a national securities exchange, and works in local communities across the USA. See https://www.finra.org/about/locations. It has sufficient local contacts to be sued in this jurisdiction. Its Dallas office is at 12801 N. Central Expressway, Suite 1050, Dallas, TX 75243.

6.     Defendant Robert W. Cook is sued in his official capacity as head of FINRA. His main offices are at 1735 K Street NW, Washington, D.C., 20006.

7.     Defendant Merrick Garland  is the US Attorney General and represents the United States' interests in defending the additional Actions for Declaratory Judgment contained herein. His primary place of business is US Department of Justice, 950 Pennsylvania Ave. NW, Washington D.C., 20530-0001.

## JURISDICTION

8.     The Court has original jurisdiction over this action in accordance with 15 USCS 78,  15 USCS 1, and 15 USCS 15. and since this is multi-jurisdictional litigation wherein

Plaintiff was damaged in his property and finances in Texas, this court also has jurisdiction on diversity of citizenship grounds (28 USCS 1332) and because the amount in controversy is more than $75,000 (28 USCS 1332). It has supplemental jurisdiction over state law claims at Texas Sec. 4008.051 Offeror or Seller Liability: Registration and Related Violations and 4008.052 Offeror or Seller Liability: Untruth or Omission.

## VENUE

9.      Venue is appropriate in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction. Defendants Brda and FINRA have sufficient local contacts in Texas to meet *de minima* standards of participation. Brda was instrumental and a key part of the MMTLP saga and was the former CEO of Torchlight Energy Inc. for the duration of its existence in Texas.

## FACTS

10.     On or about May 2, 2008, Pole Perfect Studios began filing as a private company under Central Index Key (CIK) number 0001431959. Following its merger with Torchlight Energy Resources on November 23, 2010, this CIK number transferred to Torchlight, making it responsible for subsequent filings.

11.     Torchlight began operations in the oil and gas industry in 2010. It described its business model as one "focus[ed] on drilling and working interest programs within the United States that have a short window of payback, a high internal rate of return and proven and bookable  reserves. We currently have only one interest in an oil and gas project, the Marcelina

4

Creek Field Development . . . . We anticipate being involved in multiple other oil and gas projects moving forward, pending adequate funding."

12.     On June 28, 2021, Torchlight transferred its CIK to Meta Materials upon its merger. The shared use of CIK number 0001431959 between Meta Materials and MMTLP constitutes a potential violation of SEC regulations requiring distinct identifiers for separate entities. Such actions could obscure transaction records and mislead investors, contravening Rule 10b-5's prohibition on deceptive practices in securities transactions.

13.     Additionally, improper use of a CIK undermines the record-keeping and internal control provisions under the Securities Exchange Act, which mandate precise tracking of securities filings and transactions.

14.     From 2010 to 2020, Torchlight Energy Resources (TRCH) traded a cumulative total of 745 million shares on public markets. This substantial trading volume reflected its decade-long activity in the oil exploration sector and positioned it for the eventual merger with Meta Materials, Inc. The trading history highlights the scale of its operations and shareholder engagement during this period.

15.     On or about April 23, 2020, John Brda, then CEO of Torchlight Energy Resources (TRCH), and Greg McCabe, then Chairman of TRCH, made statements inflating the valuation of the oil and gas properties that would later form NBH.

16.     They announced that a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

17.    Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion.

18.    Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction.

19.    These statements, from NBH corporate officers and social media influencers regarding the probable reserve inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition.

20.    On March 1, 2020, Torchlight Energy presented an Investor Presentation via PowerPoint or email to interested parties, emphasizing the company's focus on assets in the Permian Basin, notably the Orogrande, Hazel, and Winkler projects.

21.    The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

22.    The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

23.    In June 2020, Brda, along with the members of Torchlight Energy Resources' board of directors, resolved to pursue a strategic initiative aimed at salvaging the company

through a merger with Meta Materials Inc., a corporation focused on advanced technological innovations.

24.     This merger was presented to shareholders as a critical measure to stabilize the company, with claims that it was necessitated by the pressing need to address an overwhelming number of illegal short shares allegedly created in the market.

25.     These short positions were portrayed as a significant threat to Torchlight's financial stability, further justifying the urgency and strategic importance of the merger.

26.     Shareholders were led to believe that this merger would provide a pathway to resolve the systemic challenges posed by these short shares while transitioning the company toward a future in high-tech innovation.

27.     The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action marked a pivotal shift for both companies, setting the foundation for the creation of Meta Materials, Inc.

28.     From January 1, 2021, to June 21, 2021, Torchlight Energy Resources (TRCH) traded a total of 3.6 billion shares. This unprecedented trading volume occurred over just six months, a significant increase compared to the company's cumulative trading volume of 745 million shares recorded over the prior decade, raising concerns about unusual trading activity.

**GENERAL NBH FACTS**

29.     A proxy statement issued by TRCH and dated 5 May 2021 and filed with the SEC on 7 May 2021 stated that "Prior to the Effective Time, Torchlight will declare a dividend, on a one-for-one basis, of shares of Series A Preferred Stock to the holders of Torchlight Shares as of

the Series A Preferred Record Date. The Series A Preferred Stock is not expected to be listed on a securities exchange and will be administered by the Combined Company's transfer agent."

30.     The Preferred Stock corresponded to the oil and gas assets that historically belonged to Torchlight but were acquired by Metamaterial during the merger (the "O&G Assets"). Holders of the Preferred Stock would be entitled to receive either proceeds from the sale of the O&G Assets or, if the assets were not sold by a certain date, equity in a spin-off entity that would own the O&G Assets.

31.     Meta Materials did not sell the O&G Assets and, consequently, spun them off into NBH. To effectuate the spin-off, on July 14, 2022, NBH filed a registration statement on Form S-1 with the SEC, followed by several amendments and a final prospectus (collectively, the "Registration Statement"). The Registration Statement became "effective" on November 18, 2022.

32.     On December 14, 2022, Meta Materials completed the spin-off of the O&G Assets to NBH and, as a result, holders of Meta Materials' Preferred Stock received new shares in NBH pursuant to the Registration Statement (the "Spin-Off").

33.     The Registration Statement contained untrue statements of material fact and/or omitted to state material facts to make the statements therein not misleading. In pertinent part, the Registration Statement misstated:

        a)  The value of the O&G Assets. According to the Registration Statement, the O&G Assets were worth $47,293,607 as of September 30, 2022. This was not true. Historically, the O&G Assets were never worth anything close to that amount and sure enough, NBH later wrote down the value of the O&G Assets to $0; and

b)  NBH and its Audit Committee's ability to present accurate financial statements. Despite having an Audit Committee and independent auditor tasked with ensuring the accuracy of NBH's financial statements, the Registration Statement's financial statements contained material errors;

c) Information required under Item 404 of Regulation S-K concerning a related-party transaction involving certain O&G Assets. This related-party transaction allowed Defendant McCabe to intercept oil and gas revenues belonging to NBH. The Registration Statement did not disclose material information concerning this transaction, as required.

34.    Between May and August 2020, Torchlight participated in discussions with several entities interested in a reverse-merger. In total, Torchlight engaged in negotiations with five companies. In each instance, the negotiations failed due to issues relating to Torchlight's disposition or sale of its oil and gas assets prior to the consummation of any transaction or disagreements over the valuation of the merging entity.

35.    On September 4, 2020, Defendants McCabe and Brda held a virtual meeting with Metamaterial, after which they signed a confidentiality agreement and proceeded to negotiate the structure for a transaction.

36.    Similar to Torchlight's previous negotiations, issues arose concerning Torchlight's oil and gas assets, specifically "[Metamaterial's] desire that Torchlight divest the O&G Assets [oil and gas assets], the anticipated impact of that divestiture on Torchlight's market capitalization prior to closing the transaction (which the parties were using to determine Torchlight's valuation), the appropriate method for valuing the O&G Assets, and how the value of the O&G Assets should be allocated between each party's legacy stockholder base."

9

According to the definitive proxy statement for the merger, these issues were resolved as follows:

[Metamaterial] then suggested that the parties structure the transaction so that all of the value of the O&G Assets would be allocated to the legacy Torchlight stockholders, and on that basis agree on the pro forma ownership percentage of the Combined Company that would be allocated to each party's legacy stockholder base. This proposal was attractive to Torchlight because it provided Torchlight with flexibility with respect to eventual divestiture of the O&G Assets (including the ability to structure and consummate the divestiture after the closing of the transaction with [Metamaterial]), while also ensuring that the value obtained in the divestiture would benefit investors in Torchlight's legacy oil and gas business, and providing those investors with a substantial ownership percentage of [Metamaterial's] business on an ongoing basis (which would have a large stockholder base and access to additional capital). The parties agreed to move forward on this basis, and after substantial negotiation, arrived at the 75%/25% ownership split described elsewhere in this proxy statement, with the ultimate Exchange Ratio generally subject to adjustment for shares issued by either company for its own benefit prior to the closing of the transaction to maintain the agreed ownership split.

37.    On December 14, 2020, Metamaterial and Torchlight executed their agreement (referred to as the "Arrangement Agreement") memorializing the terms of the merger. In substance, the Arrangement Agreement was a reverse takeover of Torchlight by Metamaterial in order to facilitate a listing on the NASDAQ and broad access to the U.S. capital markets. Pursuant to the Arrangement Agreement, once Torchlight indirectly acquired all Metamaterial shares, the combined company would be renamed "Meta Materials Inc." and continue Metamaterial's operations.

38.    Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock (the "Certificate of Designation"). Pursuant to the Certificate of Designation, upon a sale of Torchlight's oil and gas assets, the proceeds from any such transaction would be distributed to the Preferred Stock stockholders, or Meta Materials would pursue a spin-off.

39.    On June 28, 2021, Metamaterial and Torchlight completed the merger, as described and agreed to in the Arrangement Agreement. In conjunction with the finalization of the merger, the combined company (*i.e.*, Meta Materials) declared a dividend that provided Torchlight's shareholders as of June 24, 2021 (*i.e.*, the record date) with shares of the Preferred Stock on a one- for-one basis.

40.    Meta Materials and/or Torchlight did not ultimately sell the oil and gas assets. Consequently, Meta Materials proceeded with the Spin-Off.

41.    From October 2021 to December 2022, the Preferred Stock traded on over-the-counter markets under the ticker symbol "MMTLP". While the Preferred Stock was trading over-the-counter, it was widely understood that it was one and the same with the NBH stock that would ultimately be received through the Spin-Off. Defendant Brda made this point publicly on Twitter (or X) prior to the Spin-Off. In response to a question from an investor as to which stock he should purchase, Brda responded that the "MMTLP" was "basically the same thing" as NBH's stock, as follows:


(page left intentionally blank)



42.    On December 14, 2022, Meta Materials completed the Spin-Off and distributed

NBH's equity to the Preferred Stock shareholders as of December 12, 2022 (*i.e.*, the record date).

In total, Meta Materials distributed 165,472,241 shares of NBH to the Preferred Stock

shareholders.

43.    Immediately prior to the completion of the Spin-Off, McCabe owned and/or

beneficially controlled 19,605,348 shares of Preferred Stock. Immediately following the Spin-

Off, McCabe owned 12,826,492 shares of NBH. Upon information and belief, McCabe

liquidated approximately 6.7 million shares of Preferred Stock on the eve of the Spin-Off. The

Preferred Stock traded between $2.90 per share and $11.65 per share during the month before the

Spin-Off (the average price was $8.15 per share). Consequently, McCabe's sale of Preferred

Stock just prior to the Spin-Off resulted in proceeds of between $19.6 million and $78.9 million.

Brda also liquidated shares of Preferred Stock just prior to the Spin-Off. As of May 5, 2021, Brda

held 2,318,322 shares of Torchlight, meaning he received an equal amount of Preferred Stock

vis-à-vis the Preferred Dividend. Upon completion of the Spin-Off, Brda received 1,930,000

shares of NBH. Consequently, Brda sold approximately 388,000 shares of Preferred Stock while

it was trading on over-the-counter markets under the ticker symbol "MMTLP" for proceeds

ranging anywhere between $300,000 and $3,000,000 based on historical trading prices.

### A. Torchlight's O&G Assets

44.    NBH's primary O&G Assets consisted of oil and natural gas leases for properties in

the Orogrande Basin in Hudspeth County, Texas (the "Orogrande Assets"); minor interests in the

Eastern edge of the Midland Basin in West Texas (the "Hazel Assets"); and two minor well

interests in Oklahoma (the "Oklahoma Assets").

### 1. Orogrande Assets

45.    The Orogrande Assets initially covered 172,000 acres in Hudspeth County, Texas.

Subsequently, the amount of acreage within the Orogrande Assets was reduced to approximately

134,000 following the release of certain leases, *i.e.*, the Clay Johnson acreage. NBH leased the

land from University Lands. University Lands is the entity responsible for managing

approximately 2.1 million acres of land in West Texas for the benefit of the Permanent University Fund.

46.    Pursuant to NBH's lease agreement with University Lands, NBH was required to drill five wells per year in years 2021, 2022, and 2023. On November 7, 2022, NBH extended the term applicable to its 2022 drilling obligations in order to stay in compliance with its drilling obligations under the University Lands lease.

47.    The Orogrande Assets were not producing properties. Of all the test wells drilled, only two produced hydrocarbons but only minimal amounts and were subsequently "shut-in." "Shutting-in" a well refers to the process of closing it down when, for example, it is not a viable well either because it does not produce hydrocarbons or the economics of developing it would be cost prohibitive. The remaining Orogrande Asset wells served as fresh water supply wells, wells for salt water disposal, or wells expected to be plugged and abandoned.

**2. Hazel Assets**

48.    The Hazel Assets consisted of approximately 12,000 acres in the Midland Basin. Through various arrangements, NBH owned approximately 80% of the Hazel Project. The Hazel Project contained two producing wells referred to as the Flying B Ranch #3H well and the Flying B Ranch #4H well from the Wolfcamp formation. As of December 31, 2021, there were no proved reserves or proved developed nonproducing reserves related to these properties (after accounting for reimbursement obligations relating to drilling costs pursuant to a development agreement with Masterson Hazel Partners, LP).

49.    Initial gross oil production from the Flying B Ranch #3H well reached 8,319 Bbl

per month and 31,613 Bbl per month of water. The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl. Notwithstanding, NBH was not entitled to receive any revenue from these wells until their estimated depletion because all revenue, after deducting expenses to produce the oil, was to be received by Masterson Hazel Partners, LP.

50.    As of December 31, 2022, 2021 and 2020, NBH's proved developed nonproducing reserves related to the Hazel Assets totaled zero barrels of oil equivalent for each year.

**3. Oklahoma Assets**

51.    The Oklahoma Assets consisted of one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

52.    As of December 31, 2022, NBH was producing from both these wells. However, the wells were marginally producing and were uneconomic for reserve calculation purposes.

**B. The Orogrande Assets Were Substantially Worthless at All Relevant Times.**

53.    The Orogrande Assets comprised the key components of the O&G Assets. According to Torchlight's management (and, later, NBH's management), the value of the O&G Assets depended primarily on the Orogrande Assets.

54.    The importance of the Orogrande Assets first emerged in 2019. On April 11, 2019, Torchlight issued a press release titled, *Torchlight Announces New Field Discovery 3rd Party Reserve Estimate of 3.678 Billion Barrels in Recovery Potential From Unconventional Zones*. In pertinent part, the press release stated:

PLANO, TX / ACCESSWIRE / April 11, 2019 / Torchlight Energy Resources, Inc. (NASDAQ: TRCH) ("Torchlight" or the "Company"), today announced that the Company has received the final petrophysical report relating to its Orogrande Basin Project. The report will be utilized in the delivery of due diligence materials to industry suitors for potential M&A discussions with Torchlight. The final report, prepared by Stimulation Petrophysics Consulting out of Denver,

outlines the potential recoverable reserves from the unconventional zones on Torchlight's 134,000 acres in the Orogrande Basin. The Orogrande is the western most sub- basin of the Greater Permian Basin.

55.    The extensive report outlines a range of recoverable values based on standardized recovery factors. Described in Potential Barrels.

Low Case 2.321 MMBOe Recovery Factor (7%) Mean Case 3.678 MMBOe Recovery Factor (11%) Best Case 4.975 MMBOe Recovery Factor (15%)

The following updates were previously disclosed:

• Additional potential of up to 20,000 acres of multiple conventional structures, based upon seismic, gravity, and magnetics

• Potential for up to 10 distinct unconventional and conventional hydrocarbon pay zones throughout the Orogrande Project at varying depths.

"We are pleased to provide this substantive update to shareholders and the broader oil and gas industry," stated John Brda, Torchlight's CEO. "Torchlight's board of directors and management feel that the third-party evaluation and resulting estimate of 3.7 billion barrels of potential recoverable oil at a 11% is a significant revelation. Although the cost to acquire the voluminous amount of science needed for this 3rd party evaluation was quite significant, we are obviously very pleased with the end results. It is unique to find a new basin predominately owned by one exploration company and with agreeable lease terms such as those we have with University Lands. As we enter and continue discussions with suitors, Torchlight will better define the current market value for one of the largest virgin onshore oil and gas basin discoveries in the United States in recent history. We look forward to reporting the impact of such value to our shareholder's ownership."

56.    Torchlight's management, including Defendant Brda in particular, reiterated this claim on several occasions over the following years prior to and after the merger with Metamaterial. For example, in an investor presentation dated March 3, 2020, Torchlight's

16

management described its "[n]ear term strategy" as prioritizing the Orogrande Assets and

provided investors with the following "Project Overview":



Similarly, during an investor conference presentation on September 2, 2020, Brda introduced

Torchlight as a "pure Permian player in that our 3 properties are in Midland Basin, the Delaware

Basin and Orogrande Basin . . . . We are in control of a world-class project that is Orogrande

project. It's 134,000 acres with derisked upside. We have independently verified from simulation

petrophysics to have 3.7 billion barrels of recoverable reserves in addition to between 5 and 8 Tcf

of gas."

57.    On December 11, 2022, just days prior to the Spin-Off, Brda reiterated the importance of the Orogrande Assets on Twitter (or X). In pertinent part, he tweeted as follows:



58.    Despite the supposed importance of the Orogrande Assets to the O&G Assets overall, they were at all relevant times substantially worthless. This conclusion is supported by NBH's impairment of the assets, Meta Materials' impairment of loans secured by the O&G Assets, and historical production and development data concerning the Orogrande Assets.

**C. NBH restated the value of the O&G Assets *after* the Spin-Off.**

59.    In the Registration Statement, NBH stated that its O&G Assets were worth $47,293,607 as of September 30, 2022.

60.    On March 31, 2023, several months later, NBH filed its first annual report on Form 10-K for fiscal 2022 (the "2022 Annual Report"), representing that the value of the O&G Assets had increased by nearly 70% to $79,695,928 as of December 31, 2022. An excerpt of the 2022 Annual Report balance sheet is below:

| | | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $ | 569,298 | $ | 1,989,410 |
| Accounts receivable | | — | | 74,310 |
| Accounts receivable, related party | | 177,519 | | 163,396 |
| Grants and other receivables | | 150,000 | | — |
| Prepaid expenses | | 62,300 | | 2,667 |
| Total current assets | | 959,118 | | 2,229,762 |
| Oil and natural gas properties, net | | 79,695,928 | | 45,663,470 |
| Other assets | | 80,179 | | 25,000 |
| TOTAL ASSETS | $ | 80,735,224 | $ | 47,918,232 |

61.    On July 17, 2024, after a delay of approximately three and a half months, NBH filed its annual report on Form 10-K for fiscal 2023 (the "2023 Annual Report"). The 2023 Annual Report contained a "restatement" of NBH's previously stated financial information; specifically, the value of the O&G Assets. As restated in the 2023 Annual Report, the O&G Assets were worth zero ($0) as of December 31, 2022. An excerpt of the 2023 Annual Report balance sheet is below:

| | | As Originally Reported December 31, 2022 | | Adjustment | | As Restated December 31, 2022 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash | $ | 569,298 | $ | - | $ | 569,298 |
| Accounts receivable | | - | | - | | - |
| Accounts receivable, related party | | 177,519 | | - | | 177,519 |
| Prepayments - development costs | | 150,000 | | - | | 150,000 |
| Prepaid expenses | | 62,300 | | - | | 62,300 |
| Total current assets | | 959,117 | | - | | 959,117 |
| Oil and gas properties | | 79,695,928 | | (79,695,928) | | - |
| Other assets | | 80,179 | | - | | 80,179 |
| TOTAL ASSETS | $ | 80,735,224 | $ | (79,695,928) | $ | 1,039,296 |

62.     Accounting "restatements" are governed by ASC 250. ASC 250-10-20 defines a restatement as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." Further, an error in previously issued financial statements is defined as follows: "An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared."

63.     Issuers must restate previously issued financial statements when they contain a material error. An error is corrected through a restatement (sometimes referred to as a "Big R restatement") when the error is material to the prior period financial statements. Restatements require the entity to restate and reissue its previously issued financial statements to reflect the correction of the error in those financial statements. NBH's "restatement" in the 2023 Annual Report constituted the correction of a material error pursuant to ASC 250-10-50-7, *i.e.*, a "Big R restatement").

64.     NBH's restatement is strong evidence that the Registration Statement provided investors with a false carrying value for the O&G Assets. While the Registration Statement provided the value for the O&G Assets as of September 30, 2022, the restatement impaired the value of the assets down to $0 just three months later as of December 31, 2022. There were no material changes concerning the O&G Assets between those dates, thereby supporting the conclusion that the value should have also been $0 in the Registration Statement.

**D. Meta Materials impaired the O&G Assets after the Spin-Off.**

65.    Meta Materials loaned NBH an aggregate of $20 million excluding interest, for use in relation to drilling activity required to maintain compliance with the lease obligations associated with the O&G Assets. At the time of the loan, NBH was still a subsidiary of Meta Materials. Approximately $15 million of the $20 million loan was collateralized by Defendant McCabe's interest in the Orogrande Assets.

66.    Meta Materials continuously tracked the value of the O&G Assets and had full access to all relevant valuation information. Following the Spin-Off, Meta Materials reported in its filings with the SEC that the value of the O&G Assets as of the date of the Spin-Off was "not substantive" and therefore increased its reserves on the NBH loan.

67.    In pertinent part, Meta Materials stated as follows in its annual report for fiscal year 2022:

Notes receivable consists of an amount due from Next Bridge, which was previously a wholly-owned subsidiary of Meta, until the completion of the spin-off transaction on December 14, 2022. One note is partially secured by a combination of Meta's common shares and an interest in the Orogrande Project Property. ***The note receivables have been recognized at their fair value, as of December 14, 2022, subsequent to the deconsolidation of Next Bridge from our consolidated financial results***.

We have assessed the fair value of the notes receivable on the deconsolidation date in accordance with ASC 820, Fair Value Measurement. In particular, we assessed the likelihood of our ability to receive the aggregate amount of the $24.2 million of notes receivable and determined that except for the security interest in our shares held by the Pledgor for the secured loan, ***the other collateral is not substantive and therefore should not serve as the basis for concluding that that loan is well secured and collateralized***; the other loan is unsecured. As a result, we reserved $22 million of the Next Bridge note receivables, resulting in $2.2 million being shown on our balance sheet as of December 31, 2022.
(Emphasis added)

Below is an excerpt from Meta Materials' annual report for fiscal 2022 showing its "Notes receivable" as of December 31, 2022:

| | | As of December 31, | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 10,090,858 | $ | 46,645,704 |
| Restricted cash | | 1,720,613 | | 788,768 |
| Short-term investments | | — | | 2,875,638 |
| Grants receivable | | — | | 175,780 |
| Accounts and other receivables | | 902,718 | | 1,665,700 |
| Notes receivable | | 2,211,900 | | — |
| Inventory | | 468,027 | | 265,718 |
| Prepaid expenses and other current assets | | 7,200,099 | | 3,451,367 |
| Assets held for sale | | — | | 75,500,000 |
| Due from related parties | | 8,461 | | 10,657 |
| Total current assets | | 22,604,676 | | 131,379,332 |
| Intangible assets, net | | 56,313,317 | | 28,971,824 |
| Property, plant and equipment, net | | 42,674,699 | | 27,018,114 |
| Operating lease right-of-use assets | | 5,576,824 | | 6,278,547 |
| Goodwill | | 281,748,466 | | 240,376,634 |
| Total assets | $ | 408,917,982 | $ | 434,024,451 |

The above "Notes receivable" amount of approximately $2.2 million reflects the money that Meta Materials believed it reasonably could expect to recover from its loan to NBH. As explained by Meta Materials in its Notes to the financial statements contained in the annual report for fiscal 2022, "We estimated and measured the fair value of the amount receivable from Next Bridge to be $2.2 million as of December 14, 2022. In estimating fair value, the key assumption used was our share price as of the date of deconsolidation, since a portion of amounts owing from Next Bridge are secured by the Stock Pledge Agreement."

68.     Despite being owed approximately $20 million from NBH, Meta Materials immediately impaired the loan to $2.2 million at the time of the Spin-Off to reflect its then-current belief of the value of the collateral underlying the loan, *i.e.*, the Orogrande Assets. This provides further proof and confirmation that the O&G Assets were substantially worthless at the time of the Spin-Off and that the Registration Statement provided a false value for them.

**E. The Orogrande Assets have historically been substantially worthless.**

69.     The Orogrande Assets are located in Hudspeth County near El Paso, Texas, on the western edge of the Permian Basin far away from the Delaware, Central, and Midland Basins. There is little infrastructure and/or oilfield service providers in the area (*e.g.*, crews, equipment, transportation). In fact, the nearest gas pipeline to the Orogrande Asset wells is the El Paso Natural Gas Pipeline, which is an average of 6.6 miles away. This makes drilling more expensive and, in turn, negatively impacts the value of the Orogrande Assets. The following map depicts the Orogrande Assets relative to the vast majority of drilling in the Permian Basin:



70.     Trail Mountain Inc. first acquired the leasing rights for what would later become the Orogrande Assets in June 1993. Trail Mountain obtained the leasing rights from University Lands.

71.     Trail Mountain drilled several vertical wells. Testing revealed poor production potential and unfavorable economics in terms of development. Consequently, Trail Mountain shut- in the wells and let its leasing rights default in 2003 after the initial 10-year term expired.

After Trail Mountain's leasing rights expired, a company named Arabella Petroleum Company, LLC, was the next to acquire them. In April 2013, Arabella Petroleum acquired the leasing rights for the Orogrande Assets from University Lands for approximately $1.07 million or $8/acre in Lease Sale #123. The Orogrande Assets comprised part of the "frontier sale" of Lease Sale #123, which denotes a speculative overage area compared to traditional lease sales where oil and gas production and reserves are proven. By comparison, non-frontier sale acreage within Lease Sale #123 leased for $5,167 per acre or nearly 650 times more in value.

72.    As part of its annual lease sale process, University Lands publishes a "Call For Nominations" whereby any eligible oil and gas company can nominate acreage to be placed into the annual auction, after which sealed bids from the industry determine the price and winning bidder. In Hudspeth County, University Lands has 493,405 acres inclusive of the Orogrande Assets, which comprises approximately 134,000 acres. Roughly 359,403 acres adjacent to the Orogrande Assets remain available to lease. In the 11 years since Arabella Petroleum acquired the leasing rights for the Orogrande Assets in Lease Sale #123, no oil and gas industry participant has had the desire or motivation to lease the available acreage because it is widely known to be unproductive or non-commercial.

73.    In fact, companies owning acreage in and/or around the Orogrande Assets have instead released their leasing rights for the acreage. For example, an individual named Clay Johnson held the leasing rights to approximately 38,000 acres adjacent to the Orogrande Assets located to the northwest of Arabella Petroleum's acreage. On March 4, 2014, the same 38,000 acres were assigned to McCabe Petroleum Corporation and then transferred to Hudspeth Oil Corporation, both entities being owned and controlled by Defendant McCabe.

74.     In August and September 2014, Torchlight acquired the Orogrande Assets, including the 38,000 acres previously held by Clay Johnson, from Arabella Petroleum through a series of transactions involving McCabe Petroleum Corporation and Hudspeth Oil Corporation in exchange for 868,750 shares of common stock and $100,000. The total acreage acquired was 172,000; however, in July 2017, Torchlight released the Clay Johnson acres without ever drilling a well on the land due to the fact that it the area is non-productive and commercially unviable. The following map depicts the Orogrande Assets relative to the Clay Johnson acres and adjacent unleased acreage:



75.     After acquiring the Orogrande Assets, Torchlight recruited a "wildcatting" partner to help finance the exploration and development of the land. Wildcatting refers to drilling exploratory oil wells in unproven or unknown territory, where oil or gas has not been previously

25

discovered. While considered a high risk and high reward endeavor, the balance of knowing

when to cut your losses based on the well results is important for purposes of capital

preservation. Operators must evaluate whether to continue production, attempt remediation

techniques, or potentially plug and abandon the well contrasting with more conservative

approaches that focus on proven reserves or extensions of known fields.

76.    In September 2015, Torchlight found a "wildcatting" partner with Founders Oil &

Gas LLC. Torchlight entered into a "Farmout Agreement" whereby Founders Oil & Gas received

a 50% interest in the Orogrande Assets in exchange for funding drilling operations.

77.    Founders Oil & Gas invested $9.5 million over approximately the next two years

helping explore the Orogrande Assets. However, Founders Oil & Gas terminated the "Farmout

Agreement" during the fourth quarter of 2017. Founders Oil & Gas's decision to terminate the

"Farmout Agreement" is indicative of the fact that testing results for the Orogrande Assets had

little-to-no potential for production and/or poor economic value.

78.    Internal correspondence by and/or on behalf of Torchlight confirm further that the

wells within the Orogrande Assets were substantively worthless. Indeed, Torchlight had

historically relied on three wells in particular to support is valuation of the Orogrande Assets.

These three wells were the University Cactus #A35 well, University Founders #A25 and

University Hueco #A39 wells. In each instance though, internal documentation show that the

wells did not produce hydrocarbons at any profitable rate.

79.    The University Cactus #A35 well was initially drilled by Trail Mountain and

subsequently shut-in. According to records with the Texas Railroad Commission, Torchlight

reentered the University Cactus #A35 well in October 2019 as a horizontal test well. By March

2020, the well had produced only 15 barrels of oil per day and 110 MCF of gas per day. In an email sent by Scott Kimbrough to University lands and the Texas Railroad Commission on September 23, 2020, Mr. Kimbrough confirmed that the University Cactus #A35 well had been shut-in on March 19, 2020 and had produced only a "Skim of oil (not a barrel & none sold) & very little gas."

80.     Mr. Kimbrough was originally on Torchlight's Board of Directors. However, after Founders Oil & Gas terminated the "Farmout Agreement," Mr. Kimbrough started Maverick Oil & Gas Corporation to operate Torchlight's wells in exchange for Torchlight stock.

81.     On January 23, 2021, McCabe wrote in an email to NBH's Chief Operating Officer, Delvina Oelkers, that the University Founders #A25 and University Hueco #A39 wells produced only "fresh water" while also being a "nightmare to drill." Producing large amounts of water alongside small quantities of oil and gas makes the wells unviable economically due to the costs of lifting, treating, and disposing of the water which often outweighs the revenue from the small amounts of hydrocarbons produced. While it is common for oil and gas wells to produce a mixture of products that need to be separated at the surface, Torchlight management was well aware that the University Founders #A25 and University Hueco #A39 test wells underlying their valuation of the Orogrande Assets produced almost exclusively a waste byproduct that would be costly to dispose of.

82.     Torchlight maintained its drilling obligations for the Orogrande Assets until October, 2024, but, to date, has not made any further progress in terms of developing the lease or proving reserves. According to well result data from both University Lands and the Texas Railroad Commission, all attempts at commercial oil and gas production have failed. Completion

27

reports (Form W-2) filed with the State of Texas also show zero oil and zero natural gas production. In other words, neither Torchlight nor NBH discovered any oil or gas within the Orogrande Assets at any point to date since the events described above.

83.    On 2 October 2024, University Lands held NBH in anticipatory breach and cancelled all of NBH's leases in the Orogronde due to NBH's failure to drill new wells.

84.    NBH failed to make royalty payments to NBH in May 2024.

## F. THE REGISTRATION STATEMENT

### 1. O&G Assets

85.    The Registration Statement was negligently prepared and contained false statements of material fact or omitted to state other facts necessary to make the statements made not false or misleading.

86.    In the Registration Statement, NBH represented in its financial statements that its oil and gas assets were worth:

- $45,663,480 as of December 31, 2021;

- $46,747,755 as of March 31, 2022; and

- $47,293,607 as of September 30, 2022.

87.    NBH's oil and gas assets were not worth the amounts listed in the immediately preceding paragraph. In truth, NBH's oil and gas assets were at all relevant times substantially worthless. As alleged in detail above, NBH restated the value of the O&G Assets shortly after the Spin-Off, Meta Materials impaired the value of a loan secured by the Orogrande Assets because the collateral was "not substantive," and historical production data confirms that the Orogrande Assets were at all relevant times substantially worthless. The Registration Statement should not

28

have provided investors with the values listed in the previous paragraph but instead indicated that the O&G Assets were substantially worthless, *i.e.*, $0.

## 2. Audit Committee Functions and Financial Statements

88.    The Registration Statement provided investors with a description of NBH's Audit Committee and its role relative to the company. In pertinent part, the Registration Statement stated as follows:

89.    Upon their appointment to the Board, the members of the Audit Committee will consist of Kristin Whitley, as the chairperson, Mia Pitts and Robert L. Cook, each of whom meet the independence requirements set forth in Rule 10A-3 under the Exchange Act and our Audit Committee Charter. ***Each member of the Audit Committee is financially literate, and Ms. Whitley has accounting and related financial management expertise and satisfies the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment***.

90.    The functions of the Audit Committee include:

• ***oversee the quality and integrity of our financial statements, accounting practices and financial information we provide to the SEC or the public***;

• ***review our annual and interim financial statements, the report of our independent registered public accounting firm on our annual financial statements, Management's Report on Internal Control over Financial Reporting and the disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations***;

• select and appoint an independent registered public accounting firm;

29

- pre-approve all services to be provided to us by our independent registered

public accounting firm;

- review related party transactions;

- ***review with our independent registered public accounting firm and our management the accounting firm's significant findings and recommendations upon the completion of the annual financial audit and quarterly reviews***;

- review and evaluate the qualification, performance, fees and independence of our

registered public accounting firm;

- ***meet with our independent registered public accounting firm and our management regarding our internal controls, critical accounting policies and practices and other matters***;

- discuss with our independent registered public accounting firm and our management

earnings releases prior to their issuance;

- ***oversee our internal audit function***; and

- ***oversee our compliance program, response to regulatory actions involving financial, accounting and internal control matters, internal controls and risk management policies***.

(Emphasis added)

91.    The Registration Statement also included a "REPORT OF INDEPENDENT

REGISTERED PUBLIC ACCOUNTING FIRM" written by BF Borgers CPA PC. The report

stated, in pertinent part, that:

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, the related statements of operations, stockholders' equity

(deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, ***the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States***.

(Emphasis added)

92.    Following its description of NBH's Audit Committee and the report from its

independent auditor, the Registration Statement included the following statement within its

"Notes" to NBH's financial statements:

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:
*Basis of presentation* – The financial statements are presented on a consolidated basis and include all of the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated. These interim financial statements are unaudited and have been prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. Certain disclosures have been condensed or omitted from these financial statements. Accordingly, they do not include all the information and notes required by accounting principles generally accepted in the United States of America ("GAAP") for complete consolidated financial statements, and should be read in conjunction with the audited consolidated financial statements and notes thereto included herein for the year ended December 31, 2021.

***In the opinion of management, the accompanying unaudited financial condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for, all periods presented***. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the condensed financial statements and disclosures of contingencies. Actual results may differ from those estimates. The results for interim periods are not necessarily indicative of annual results.

(Emphasis added)

31

93. The statements in the immediately preceding paragraph were false or, at least, materially misleading because the financial statements within the Registration Statement did not "fairly present" the value of the O&G Assets. The description of the Audit Committee's roles and responsibilities combined with the report from BF Borgers lent credence to management's statement above that the financial statements in the Registration Statement were accurate when, in fact, they were not because the O&G Assets were at all relevant times substantially worthless.

**G. Regulation S-K Violations**

94. Regulation S-K is a set of rules promulgated by the SEC that requires public companies to disclose certain information to shareholders and potential investors. Regulation S-K applies, in particular, to information that must be disclosed in registration statements. As applicable here, Defendants failed to adhere to Item 404 of Regulation S-K, 17 C.F.R. §229.404. Item 404 of Regulation S-K it titled, *Transactions with related persons, promoters and certain control persons*, and requires issuers to describe related-party transactions by providing specific information, including but not limited to: the name of the related person(s); the related person's interest in the transaction; the dollar value of the amount involved in the transaction; and the approximate dollar value of the amount of the related person's interest in the transaction.

95. The Registration Statement failed to disclose a related-party transaction involving Defendant McCabe and the Hazel Assets. As described above, the Hazel Assets included the only two wells capable of generating revenue, *i.e.*, the Flying B Ranch #3H well and the Flying B Ranch #4H well. However, pursuant to a development agreement, NBH was not entitled to receive any revenue from these wells until their estimated depletion because all revenue, after deducting expenses to produce the oil, was to be received by Masterson Hazel Partners, LP.

32

96.    NBH referred to the development agreement concerning these wells as the

"Option Agreement with Masterson Hazel Partners, LP" (the "Option Agreement"). In pertinent

part, the Registration Statement described the Option Agreement as follows:

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. ***Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020***. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. ***MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well***.

In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

(Emphasis added)

97.    The Option Agreement was important relative to NBH's overall operations

because it operated to prevent NBH from receiving any revenue from the only two producing

wells that existed, *i.e.*, the Hazel Assets. Despite the importance of the Option Agreement and the

implications it created in terms of generating revenue for NBH's new investors, the Registration

Statement omitted material information concerning it that should have been disclosed pursuant to

Item 404 of Regulation S-K, *i.e.*, Defendant McCabe's interest in the transaction.

33

98.     The Option Agreement was executed between Torchlight, Masterson Hazel Partners, LP, and McCabe Petroleum Corporation. Brda signed on behalf of Torchlight, DuBose signed on behalf of Masterson Hazel Partners, LP, and McCabe signed on behalf of McCabe Petroleum Corporation. Although McCabe's presence in the transaction was known, it was understood at that time to be limited to his ownership and/or interest in McCabe Petroleum Corporation and not Masterson Hazel Partners, LP. This was significant because the Option Agreement provided Masterson Hazel Partners, LP (and not McCabe Petroleum Corporation) with the right to receive revenue from the Hazel Assets.

99.     In truth, McCabe also held a material interest in Masterson Hazel Partners, LP through an intermediary entity named Masterson Hazel Management LLC. Masterson Hazel Management LLC was jointly owned by McCabe Petroleum Corporation (of which McCabe was the sole owner) and another entity named Korban Resources, LLC (of which DuBose was the sole owner). Thus, while the Option Agreement appeared to provide revenue from the Hazel Assets to Masterson Hazel Partners, LP only, it was in fact also providing McCabe Petroleum Corporation with revenue.

100.     Given McCabe's multiple roles and interests in the Option Agreement, the Registration Statement violated Item 404 of Regulation S-K by failing to disclose the following:

• McCabe's interest in the Option Agreement vis-à-vis Masterson Hazel Partners, LP and Masterson Hazel Management LLC;

• The amount of money McCabe has received pursuant to the Option Agreement in exchange for drilling and exploration in the Hazel Assets;

• The amount of money McCabe would continue to receive pursuant to the Option

Agreement;

• The amount of money NBH would continue to **_not_** receive pursuant to the Option

Agreement; and

• McCabe has received and would continue to receive money pursuant to the Option

Agreement despite the fact that Masterson Hazel Partners, LP failed to comply with the

initial requirement to "drill and complete" one well on the southern half of the Hazel Assets

by September 30, 2020.

**FINRA FACTS**

101.     In June, 2021, NYSE market maker GTS Securities ("GTS") together with

another Canadian market maker, jointly filed paperwork without MMAT nor TRCH executives'

permission to facilitate registering the "Series A Preferred Stock" to enable it to trade on the

Over The Counter (hereinafter "OTC") market for NASDAQ. This was done with forethought

and could only have been done with scienter.

102.     GTS and Canaccord used 10 year old dated information in derogation of FINRA

rules and submitted falsified Form 211's in order to make what would become MMTLP tradable.

This was done with forethought knowing it would harm investors in MMTLP.

103.     The confirmation that FINRA would allow for all manner of irregular stock

trading in MMTLP was written in plain English: in a letter dated 21 June 2021, the OCC stated

that the "Series A Preferred Shares" would not trade, yet noted to options traders that they did not

have to close out any short positions through the merger until OTC could get what would

become "MMTLP" could trade – exactly the opposite of what the merged companies had wanted

and had filed. FINRA knew or should have known that this was an inducement to illegality in the trading of TRCH and eventually MMTLP by not forcing shorts to close out positions prior to a merger. FINRA was aware of this being at odds with common and legal securities trading practice and allowed it to pass unchallenged showing its institutional scienter in the MMTLP trading and later U3 halt is committed.

104.    The OCC 21 June 2021 memoranda outlined above was only shared with market makers, hedge funds, and certain broker-dealers to include GTS.

105.    GTS had a duty to record all short sales to include naked shorts and was in addition given extra time to close out fails-to-deliver under the "market maker exemption" rule.

106.    Referencing the above, FINRA Rule 204(b) provides exceptions for bona fide market making activities in that market makers engaged in bona fide market making are given additional time to close out fails-to-deliver arising from such activities but are also bound to maintain daily records of their fails-to-deliver and report them "as required to ensure transparency and regulatory oversight." FINRA never checked GTS to insure compliance with the rule.

107.    GTS knows exactly how many shares of MMTLP were sold both long, short, and naked short from 21 June 2021 to 9 December 2022.[1]

108.    The Depository Trust & Clearing Corporation (hereinafter "DTCC") is chartered to maintain exacting records of securities trades and to provide electronic means for recovering and disseminating information related to securities on the US stock markets.

_____

[1] The Depository Trust Clearing Corporation also has this data as does the New York Stock Exchange. Only through discovery of GTS' internal files and electronically stored information ("ESI") will the exact extent of the overselling and distribution of "naked shorts" be possible.

109.    The DTCC  has an auxiliary way of knowing exactly how many shares of MMTLP were sold both long, short, and naked short from 21 June 2021 to 9 December 2022 not only from record keeping but also via payments for clearing and settlement made by GTS to them for shares moved in any capacity from GTS computerized trading systems; DTCC collects clearing fees, settlement fees, and custody fees.

110.    FINRA was allegedly made aware of this falsification by TRCH CEO John Brda (hereinafter "Brda") and MMAT CEO George Palikaras (hereinafter "Palikaras") and took no action to keep MMTLP from trading.[2]

111.    Brda did not challenge the illegal registration of MMTLP. Upon information and belief, Brda did not want SEC scrutiny of TRCH or the merger because it would have shown other illegalities in TRCH.[3]

112.    TRCH and MMAT completed their merger on 28 June 2021.[4]

---

[2] Brda and Palikaras are both the subject of US District Court (Southern District of New York) civil cases for fraud in the MMTLP fiasco.

[3] Brda had paid approximately $900,000 in another fraud case prior to the TRCH merger. On or about April 23, 2019, Brda, then CEO of Torchlight Energy Resources (TRCH), and Greg McCabe, then Chairman of TRCH, made statements inflating the valuation of the oil and gas properties that would later form NBH. They announced that a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting. As of this writing, these fields are effectively worthless.

[4] Circumstantial evidence shows that Brda and GTS were in cahoots as there is social media acknowledgement that Brda actually filed for a cusip number (a specific stock trading serial number for each security registered to trade under FINRA rules) for MMTLP but – again – FINRA and OTC-UTC records are not available to private citizens and have been the subject of FOIA's to the SEC and they have been routinely denied. Discovery is the only way to sort it out.

113.    There were approximately still outstanding 200 million to potentially 900 million shares sold short of TRCH that carried, unclosed, into the merger with MMAT.[5] Other data involving the 3.6 billion in total trade volume points to the possibility that the TRCH merger with MMAT saddled MMTLP with more than 1 billion naked short shares from the moment it started trading.

114.    On 15 July 2021, MMAT filed an S-1 to create a spinoff of MMAT (which would come to be MMTLP) into a private company to be named Next Bridge Hydrocarbons (hereinafter "NBH").

115.    Circumstantial evidence suggests that GTS personnel conspired with Michael Dunn at Charles Schwab and Co. Inc.  to prematurely get MMTLP entered into the books at Schwab on 31 July 2021 (it became a component of Schwab's Index Fund "SWTSX" on that date) and allow for certain traders using Schwab to begin naked shorting a stock that did not even exist legally for trading until 6 October 2021. This shows a horizontal monopoly in place, scienter because of the forethought.

116.    Referencing the prior FACT, Schwab noted in its statement regarding the index fund that *"holdings may include collateral held by the fund for securities on loan. In addition, certain securities may be designated as collateral for transactions such as open futures contracts or delayed-delivery solutions."*

117.    MMTLP began trading in the OTC market on 6 October, 2021.

---

[5] "A short sale is a sale of a security that the seller does not own or does not have the right to sell, with the expectation of buying the same security later at a lower price to cover the short sale." (SEC Rule 200(g)(1)).

118.    In an email dated 12 October 2021 from Schwab's Michael Dunn, states to a

Schwab customer with questions over how MMTLP came to trade in so many different ways at

variance with normal procedure:

*Hello,*

*In regard to a couple of items we discussed (keeping everything non-account specific to be in line with Schwab email policies):*

*Upon review, this was never restricted by Schwab. I didn't fully realize on our call 10/7 was the first day of trading it was a new issue that had never traded before and wasn't able to sync up with all the OTC info so it could be restricted. The OTC markets site was apparently updated mid day on 10/7 and before the opening on 10/8 as far as allowing normal quoting/trading not only in a non-electronic market going forward.*

*This is an extremely unique situation in which a stock would simultaneously be a new issue (of sorts), but also be still amid a process of getting updated financials so that on day 1 of trading , it wasn't fully eligible for market maker quoting.*

*Kind regards,*

*Michael S. Dunn*
*Resolution Manager*
*Denver Trade Support*
*Specialty Trading Group*

119.    MMTLP immediately became violently shorted as it started to trade and never

came off FINRA's OTC "Threshold List" for the entirety of its brief trading history after being

tagged on that list on 14 October 2021.[6]

---

[6] The Threshold Security List is a list of securities that have a high level of fails-to-deliver (FTD) activity, which is when a broker-dealer sells a security but does not have the security available to deliver to the buyer. The list is used to identify securities that may be subject to increased regulatory scrutiny and to help broker-dealers identify and address potential issues with their trading and clearing activities. (FINRA Rule 4320).

120.    Between 6 September 2022 and 9 November 2022, MMAT filed S-1s and revisions that were eventually to become effective on or about 18 November 2022.[7]

121.    GTS sold naked shorts using the market maker exception in MMTLP and *there is no evidence available that they ever did a FINRA mandated "locate" of those shares at any time whatsoever* to legally emplace them into the stream of securities commerce involving MMTLP.

122.    GTS routinely closes out its books for each reporting year by having billion dollars in total securities sold but not yet bought. In 2023, for example, GTS had $62 billion (approximately) of securities in derivatives and about $9 billion in securities sold but not purchased (shorts).

123.    Schwab is oversold in MMTLP by 500%, has denied on 10 July 2024 being oversold, yet had admitted that it had 1.8 million shares sold short on its books in June, 2023 via a TDA client.

124.    Two online survey of MMTLP shareholders done in 2023 showed that MMTLP was oversold by at least 400 million shares, with both surveys estimating that number could be as high as 600-700 million.

125.    Scott Traudt, the Plaintiff in *Traudt v. Rubenstein*, Case No. 2:24-cv-872 (US Dist. Ct. VT) conducted a survey of proven MMTLP shareholders on or about 1 October 2024 and

---

[7] The SEC defines an S-1 as a "registration statement under the Securities Act of 1933" that is used to register the offer and sale of securities, including common stock, preferred stock, debt securities, and other types of securities. The S-1 registration statement typically includes information about the company, its business, its financial condition, its management, and its securities being offered. The statement is designed to provide investors with a comprehensive overview of the company and its securities, and to ensure that the company is in compliance with federal securities laws.

received 257 responses. The extrapolation off the data Traudt received concurred that at least 400 million and as many as 600+ million shares were oversold in MMTLP by the broker-dealers, to include Schwab.

126.    Broker-dealer TradeStation was oversold and admitted it publicly, the exact extent is at least 200% according to online "share registration polling" conducted in the summer of 2023.

127.    FINRA operates, maintains, and controls its own stock exchange (XADF) on the OTC-UTC exchange and coordinates activities therein with JP Morgan Chase in complete contravention of its rules and mandate from SEC and uses a trading system created and owned by Prof. James Angell from Georgetown University to manage it through Intelligent Cross LLC.

128.    FINRA as a self-regulatory organization (SRO) has no standing under *Loper Enterprises v. Raimondo* (US Supreme Ct. #22-451, 2024) and *West Virgina v. EPA* (#20-1530, 2022) to maintain the U3 halt and is routinely using powers and authority not delegated to it by Congress.

129.    FINRA's U3 halt was illegal under *West Virginia* as the rarity by which the U3 halts happen (only three times since the Securities Act of 1934 was passed) and because it is illegal under the revised "major questions" doctrine by which the US Supreme Court reined in a federal agency making policy decisions for Americans when it had no power to do so; the U3 halt was orchestrated by two Wall Street back benchers and aided and abetted with a cartel sitting in the room with them with vested financial interest in seeing the shorts remaining unclosed because of their exposure to catastrophic losses.

130.    That FINRA has "immunity" from a damage claim as a *private* SRO is impossible to sustain in the wake of *Loper* as the decision was not appealable, was done by a private organization usurping Congressional law making powers, contravenes the clear and unambiguous language of 2010's Dodd-Frank laws, and because as an SRO it was – if the legality of its existence is not called into question – simply impossible for it, and the US government, to not be seen as one. FINRA's immunity allows it to routinely make and break its own rules, which is *prima facie* evidence of scienter. (It mangled the Corporate Action for MMTLP end-of-trading conversion to NBH specifically to induce confusion into the market and provide it the "plausible deniability" it would need for the U3 halt that devastated investors in MMTLP. This is pure evidence of scienter.

131.    On 22 November 2024, the DC Circuit Court of Appeals ruled in *Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of America* (Case No. 1:23-cv-01506, https://media.cadc.uscourts.gov/opinions/docs/ 2024/11/23-5129-2086156.pdf) that that Alpine (a private securities broker that has raised non-delegation and Appointments Clause constitutional challenges against FINRA after FINRA attempted to shut them down prior to court review of the suspension process used by FINRA) demonstrated a likelihood of success on its private nondelegation claim, as FINRA's expulsion orders take effect immediately without prior SEC review, effectively barring Alpine from the securities industry. The court held that this lack of governmental oversight (by the SEC over FINRA) likely violates the private nondelegation doctrine. The court also found that Alpine faced irreparable harm if expelled before SEC review, as it would be forced out of business.

132.    The key event in *Traudt* and this matter was the U3 trading halt issued by FINRA to halt trading in MMTLP stock on 9 December 2022. This U3 halt was never validated by the Securities Exchange Commission ("SEC"). Mirroring this new ruling in *Alpine*, this clearly ran afoul of the private non-delegation doctrine.

133.    Plaintiff will suffer irreparable harm if the U3 halt continues and this harm exactly mirrors the harm identified in *Alpine*.

134.    All of the factors identified in *Alpine* are evident in this instant action as effecting the Plaintiff: irreparable harm in the 100% loss of all investments made into MMTLP (ergo "destruction in its current form"); there is no ability save for injunctive relief (a restart in trading in MMTLP for example) to make Plaintiff whole; and the public interest in a fair market not subject to an arbitrary and capricious decision made by an "illegitimate proceeding, led by an illegitimate decisionmaker" to quote Judge Walker in *Alpine*.

135.    The nondelegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined limits, particularly in situations where their actions impose significant and lasting consequences on market participants. FINRA's actions with the U3 halt were taken in excess of its authority.

136.    On or about 26 November 2024 Scott Traudt emailed SEC Atty. Mike Bailey (Office of General Counsel) and requested pursuant to *Alpine* that the SEC reopen trading in MMTLP for 2 days' pay to close trading only so that short positions outstanding in MMTLP could be closed and anybody not wanting to have their shares carry over into NBH could sell.

137.    Plaintiff nor any other investor cannot bring a claim against FINRA under the Administrative Procedures Act because FINRA is not a US federal agency.

138. Plaintiff nor any other investor cannot bring FOIA requests to FINRA because it is not a US federal agency.

139. Between October 1, 2022, and December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50.

140. During this period, the market capitalization for MMTLP, a relatively unknown preferred share dividend, fluctuated between approximately $1.5 billion and $6.5 billion.

141. Given the company's total authorized share count of 165.5 million, this level of market capitalization and volatility suggests the potential influence of synthetic (rehypothecated) shares or naked short selling.

142. Between November 15 and December 5, 2022, John Brda sold approximately 388,000 shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and $9.90. Based on this price range, Brda's transactions generated proceeds estimated between $300,000 and $3,000,000.[8]

143. Publicly available social media posts from this timeframe show that Brda encouraged others to purchase MMTLP shares and denied selling any of his own shares.

144. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt. At the time of the sale, Brda was a paid consultant to NBH.

---

[8] Upon information and belief, Brda either sold because he was tipped off to the MMTLP trading halt or he knew the NBH oil field leases were worthless having been in and around these same fields with virtually zero productive capacity since 2014.

145.    On or about November 30, 2022, to 8 December 2022, NBH CEO and majority owner Gregory McCabe ("McCabe") sold approximately 6.7 million shares of MMTLP out of his total holdings of 19,605,348 shares.[9]

146.    Based on this price range, McCabe's transactions generated proceeds estimated between $19,600,000 and $78,900,000. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.

147.    The "temporal proximity" of the Brda and McCabe trades demonstrated that they may have been tipped off to the looming U3 halt by others.

148.    Brda and McCabe knew that the NBH oil well leases were valueless and knew as much as early as 2014 and made the decision to use the price run up to execute the "pump and dump" that was the MMTLP trading.

149.    On June 28, 2021, during the merger of Torchlight Energy Resources and Metamaterial Technologies Inc., Gregory McCabe, a key executive and shareholder, highlighted the substantial value of the Orogrande Basin oil and gas assets.

150.    Public filings and disclosures at the time valued these assets at $47 million—significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves. Subsequent disclosures during the Next Bridge Hydrocarbons spin-off revealed notable discrepancies in this valuation.

151.    Brda had stated on a recorded public call on Twitter that MMTLP would go to $100, and that he and McCabe had no plans to sell.

---

[9] This is an uncertain number as different bookkeeping records (10ks) show him owning over 13%.

152.    McCabe has refused to answer any and all questions from NBH shareholder Scott Traudt and others. McCabe was served with a books and records request by eight MMTLP/NBH investors on or about 20 November 2024. To date he has refused to respond.

153.    McCabe would not identify the entity nor the amount sought to be purchased after issuing an NBH public relations statement (23 January 2024) stating he had been approached by a short seller of MMTLP who held "multiples" of the 2.65 million shares short that FINRA's Cook acknowledged to Congress. Traudt questioned McCabe on this in October, 2024 via an email exchange. McCabe emailed another person representing that she was an NBH shareholder, and in that email asserted a conspiracy of "dark forces" was out to destroy NBH, and called Traudt as being "compromised" for merely wanting answers to NBH business and finances.

154.    MMAT's S-1 became effective after FINRA review on 18 November 2022.

155.    Plaintiff owns and has custody and control over 58,282 shares of MMTLP purchased at an average of $7 a share from on or about October 2022 to 8 December 2022 from Schwab for approximately $400,000 relying on a free and fair market and unaware of the Schwab and FINRA monopoly that had already made use of millions of counterfeit shares created by GTS.

156.    At various times between 30 November 2022 and 8 December 2022, Plaintiff attempted to set sell his MMTLP shares via Schwab's online trading system.

157.    Plaintiff attempted to sell his MMTLP shares at prices that were being accepted as orders from other broker-dealers but was barred by Schwab from doing so.

158.    Plaintiff was unable to sell any of his shares due to the U3 trading halt requested by Schwab effectively wiping out the last 2 days of trading in MMTLP. FINRA claims

ownership of all OTC-UTC registered securities, which by definition meant MMTLP at the time

of the halt:

(page left intentionally blank for graphic that follows)



12:17

# UTP
## UNLISTED TRADING PRIVILEGES

Technical

### UTP Plan Functions of the Processor

The plan selected Securities Information Processor (SIP) shall make available the UTP Data Services:

- UTP Data Services are comprised of the UTP Quotation Data which provides (i) National Best Bid and Offers; (ii) each Member's Best Bid and Offer and their sizes and the Member's identifier; and (iii) in the case of FINRA Alternative Display Facility ("FINRA ADF"), the identifier of the FINRA ADF Participant(s) that constitute(s) FINRA's ADF Best Bid and Offer quotations, in each case for Nasdaq-listed securities.
- Along with the UTP Trade Data which provides Transaction Reports in Nasdaq-listed securities.

### UTP Data Services (Nasdaq-listed securities Tape C)

**Technical Documents**

- UTP Data Feed Services Specification (UTP Quotation / UTP Trade)
- UTP Snap-Shot Service Specifications
- UTP Participant Input Interface (Inbound)
- UTP Transmission Schedule
- SIP Emergency Procedures
- UDP/IP Addresses link: UTP Data Feed Services
- SIP Market-Wide Circuit Breaker Overview

### FINRA OTC eligible securities

While the FINRA OTC eligible securities are administered as part of the UTP Plan Administrator role, The Financial Industry Regulatory Authority (FINRA) is the owner of the OTC eligible securities and the FINRA OTC Reporting Facility (ORF) and TRACE systems. **FINRA is responsible for all technical product management related to TDDS 2.0.**

- For all technical questions regarding the FINRA feeds, contact FINRA Product Management at (866) 899-2107.
- For information related to FINRA transparency-services visit FINRA website

AA          🔒 utpplan.com          ⟳

159.    On 29 November 2022, heavily redacted emails obtained by MMTLP shareholders from the SEC under 5 USCS 552 - the Freedom of Information Act (hereinafter "FOIA") – showed that FINRA Vice President of Market Operations for Transparency Services Patricia Casimates (hereinafter "Casimates") was emailed by FINRA Fraud Officer Sam Draddy (hereinafter "Draddy") ostensibly about MMTLP and included three SEC officers.

160.    On 2 December 2022 Richard Boyle from FINRA's National Cause and Financial Crimes Detection Program emailed Jay Gibbon at FINRA and courtesy copied another SEC officer who was redacted from the email that stated that *"I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer [Meta Materials/Next Bridge Hydrocarbons] and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market fraud Investigations team recently received several tips that appear to have also been sent to the SEC."*

161.    On 5 December 2022 Draddy emailed three redacted SEC officers, FINRA's Boyle and Jay Gibbon, and stated in the email that it *"-looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our General Counsel's office – but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak."*

162.    On December 8, 2022, John Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a

49

FINRA-approved corporate action. Mendl confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

163.   FINRA's Fraud Team did not halt nor advise a halt in any and all further regulatory approvals by FINRA subsequent to Draddy's email, above.

164.   On 6 December 2022 FINRA issued an intentionally erroneous "Daily List" Corporate Action notice regarding MMTLP that was at odds with prior approved MMTLP guidance by stating that MMTLP shares would be "cancelled" on 13 December 2022 – a date never entertained nor mentioned by NBH or MMAT management - despite other wording stating in the same notice that shares would transition from MMTLP into NBH on 14 December 2022 and did so stressing to NBH that NBH was "not to edit or interpret it."

165.   In the same notice as above, FINRA changed the language of the pay date and simply stated that MMTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP.

166.   Schwab marked MMTLP short share ability at "limited" on 6 December 2022 during the trading day "lit" (normal daytime OTC market) and set a borrow fee of 23% and at the same time the parent to MMTLP (MMAT) had an enormous borrow rate of 115% indicating that Schwab was having great difficulty finding clients' shares to lend.

167.   On 9 December 2022, after the U3 halt, Schwab's MMTLP's borrow rate increased to 27.5% even *with* a trading halt and its availability was marked "not available." This indicates it was still trading in dark pools/alternative trading systems.

168.    On 6 December 2022, MMTLP started trading at $7.15 a share, ran as high as $9.50 a share, and eventually closed at $8.18 with a total volume of 5,000,000 shares traded.

169.    On 7 December 2022 (the day after the FINRA released its intentionally confusing and damaging Corporate Action to the Daily List), MMTLP started trading at $9.90 a share, never ran higher, and closed at its daily low of $7.00 on 4,220,000 shares traded for volume.

170.    On 8 December 2022 (the last day of trading for MMTLP as on 9 December 2022 the U3 halt occurred), MMTLP started trading at $6.15 a share (which was the high point for the day), and eventually closed at $2.90 a share with a total volume of 13,710,000  shares traded and in total defiance of financial physics as the volume was indicative of short position holders not closing out their positions, and also that algorithmic trading facilitated by GTS was systematically destroying MMTLP's share price by supplying naked shorts illegally to enable a "short attack" wherein GTS, with a nod of approval or at least quiet acquiescence from the major players in the brokerages to include Schwab, flooded the trading with counterfeit shares and used the weaponized-against –retail-investors high-frequency trading systems at GTS to utterly eviscerate the possibility of a "short squeeze" in MMTLP. This was in keeping with its participation in the horizontal monopoly that was the GTS, Schwab, FINRA axis.

171.    From the closing bell on 6 December 2022 to the closing bell on 8 December 2022, MMTLP lost 53% of its value.

172.    Various exchanges trading in MMTLP began to report "505" codes across the board on 6 December 2022 which is trading code for "I am out of shares" signaling that MMTLP was wildly oversold and shorted to apocalyptic levels.

173.    More uncertainty and confusion were deliberately added to MMTLP investors when on 8 December 2022 FINRA issued another "Daily List" notice stating (now) that MMTLP would be "deleted" on 13 December 2022.

174.    On 8 December 2022 MMTLP was trading in the pre-market on OTC in significant volume in what appeared to be an obvious attempt to scare investors.

175.    In the same notice as #173, above, FINRA changed the language of the pay date and simply stated that MMTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP. This was clearly done with malice and to cause confusion and is the requisite scienter for securities fraud allegations.

176.    Per FINRA's own rule 6490, any issues with regards to *settlement or fraud* should have been discovered during the review of not one but two confusing Corporate Actions notices dated on 6 and 8 December 2022 respectively. FINRA broke its own rule. More scienter.

177.    It was FINRA's pattern and practice of conduct in securities prior to the MMTLP U3 halt of 9 December 2022 to state, in stocks going from publicly traded to private, that short position holders had to "buy to close out short positions only" or reasonable facsimile thereof. This was not stated for MMTLP's trading closeout and is more evidence of scienter.

178.    On 8 December 2022, FINRA at 3pm EST placed a "caveat emptor" notice on MMTLP stock the night before they officially halted trading in it leaving 65,000 shareholders holding long positions no ability to sell, nor make use of the farcical "caveat emptor" warning.

179.    Proof Schwab was alerted to the U3 trade halt (and thus evidence of insider trading) began early on 8 December 2022 when a customer service representative warned TDA client Ryan Franz to make sure he sold his shares in MMTLP on 8 December 2022 as it would

not be trading the following day. Franz has submitted an affidavit to this effect and Schwab/TDA has a recording of this call. This is clear evidence that Schwab/TDA knew in advance of a trade halt and did not share with all customers. This is more evidence of scienter in terms of data being withheld to protect its corporate interests.

180.    Months after the 9 December 2022 U3 trade halt, Charles Schwab & Co. sent emails and/or text messages to MMTLP shareholders, Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares. Numerous other shareholders received the same guidance from Schwab. This violates the terms of the client agreements with Schwab by shareholders as Schwab, under the terms and conditions of the client agreement, must maintain regulatory adherence to the SEC and FINRA rules. This refusal is anticipatory breach of contract and also is clear proof of scienter.

181.    FINRA, citing some "extraordinary event" and acting under the auspices of FINRA Rule 6440(a)(3) and by decision of the Vice President of Transparency Services Chris Stone, initiated a U3 halt in trading of MMTLP "officially" on 9 December 2022.

182.    The trade halt in MMTLP was without notice to retail investors (save for one documented case, above, involving Franz and Schwab) but with plenty of notice to corporate, hedge, market makers, and "whale" investors as the members of the UPC were aware of the halt and *acted accordingly in their own institutions.*

183.    Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These

restrictions would have limited new short positions and helped stabilize the market during the transition.

184.    FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt. Two others followed on later from FINRA.

185.    Despite receiving thousands of complaints from shareholders these  FAQs remained, to date, FINRA's only significant communication with shareholders regarding the halt were these self-serving and erroneous FAQs.

186.    A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

187.    On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning Meta Materials Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

188.    On January 15, 2024, NBH executives, including Clifton DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition.

189.    As of November 26, 2024, there is no publicly available information indicating that Representative Ralph Norman's December 22, 2023, letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

190.    While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

191.    Throughout 2019 to 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

192.    Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic shares.

193.    From late 2022 through early 2023, AST/EQ, acting as the designated transfer agent to convert MMTLP shares into NBH shares, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved.

194.    The prolonged inaction by FINRA over the last two years combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

195.    Information from Casimates and Stone was provided to UPC board members on or about 2 December 2022.

196.    Casimates chaired the "halt" committee (the UPC, more or less) and without challenging industry representatives if they had a counter-party interest in the information she provided about MMTLP (how much were their respective institutions exposed either from oversold pure counterfeit positions or from deep exposure to synthetic shorts or conventional

55

shorts?), brought them all into the fold with Stone having the final say as "Transparency" vice-president for FINRA in moving to halt trading.

197.    Upon information and belief, FINRA purposely mislead the public and Congress about the reasons for the U3 halt issued by Stone (approved by Cook) by stating it was due to an "extraordinary event" and "uncertainty in the settlement process" when in fact Draddy had pulled the infamous "bluesheets" (the FINRA "Electronic Blue Sheets") on MMTLP which showed not only was it horrifically oversold, but it had short positions at a staggering level.

198.    Draddy had identified widespread fraud in MMTLP no later than 5 December 2022.

199.    Robert W. Cook, FINRA's President, wrote a 31 January 2024 letter to Congressman Ralph Norman that brings him clearly within the legal pincers of 18 USCS 1001 for "knowingly and willfully" lying to Congress in that in that letter Cook states: *"FINRA also did not provide any advance notice of the trading halt to broker-dealers, hedge funds, or any other market participant."*[10] Cook had a duty to be truthful to Congress, and by extension, investors in MMTLP. This continued contempt for the truth shows a cover up at FINRA was ongoing and thus, scienter is evident.

_____

[10] False Statements Act (18 U.S.C. § 1001): This law makes it a crime to make false statements or representations to any department or agency of the United States, including Congress. The penalty for violating this law can range from a fine to imprisonment for up to five years.

200.    *Prima facie* evidence that the looming U3 halt was coming was that there was no attempt by short sellers or owners of naked shorts to close out their positions in the last week of trading.[11]

201.    Using a document off the SEC's own website that was and is considered the work of a securities industry expert entitled *Counterfeiting Stocks 2.0,* even the wildly understated admitted to 2.65 million shares acknowledged by FINRA are coupled with *at least* 50 times that number in naked shorts created by Rubinstein and GTS.

202.    Referencing the above, *Counterfeiting* states "one emerging company for which we have been able to get reasonable estimates of the total short interest, the disclosed short interest, the available stock lending, and fails-to-deliver, has fifty "buried" counterfeit shares for every FTD share, which is the only thing the SEC tracks, consequently the SEC has not acted on shareholder complaints that the stock is being manipulated."[12]

203.    Based on FINRA's spectacularly understated and *by their own admission* uninformed accounting regarding offshore shares and shares moved on alternative trading systems as attested to in the infamous Cook 31 January 2024 letter to Congressman Ralph Norman and using the 50X factor of buried counterfeit shares as identified above, there are a *de minima* level of 132 million shares still short in MMTLP of all flavors: short and naked short counterfeits.

_____

[11] Total unclosed short positions in MMTLP are approximately 900 million shares depending on what numbers available in the wild are used. FINRA refuses to provide "bluesheet" data that would give an accurate share count of long positions and short positions that were not closed out.

[12] See https://www.sec.gov/comments/s7-07-23/s70723-20162302-331156.pdf

204.    Cook's statement above can immediately be dismissed as false because the members of the UPC committee were comprised of the following individuals from the securities industries: John Meegan (Hefren-Tillotson), Tom Nicholson (D.A. Davidson & Co.), Mathew Price (Fidelity Investments), Jeffrey Sheftic (Lincoln Financial), Joseph Iraci (Robinhood), Christopher Haines (Edward Jones), Kelly Bell (Hilltop Securities), Steven Paul Dapcic (Pershing LLC) and to this date FINRA has *never* answered simple questions as to whether any of these individuals (like Mathew Price whose Fidelity Investments operation held 21,000,000 shares of MMTLP and Joe Iraci whose Robinhood had 12,804,287 shares) had any counter-party risk.

205.    On or about 6 February 2023, FINRA personnel further tried to cover up to no effect as it was rapidly uncovered that certain paperwork in their files and publicly presented had been altered; *inter alia* FINRA backdated the D-1 forms in MMTLP. This is at least tortious conduct by FINRA.

206.    On 6 February 2023 the CEO of OTC Markets Cromwell Coulson stated that no 211's was filed on MMTLP because the company was in good standing under the SEC's rule but does not note that the company never filed its own paperwork as it did not want it to trade; this is at variance with evidence that paperwork was filed by GTS and Cannacord.[13]

207.    On 6 February 2023 Coulson posted on Twitter (now "X" after Elon Musk bought it) that "the ongoing question is how do short position holders resolve their liability for the Next

---

[13] It is clear that MMTLP was subject to such dumpster fire levels of fraud and regulatory insanity on behalf of heavy breathers in the NYSE financial ecosystem that straight answers are only going to be received through the discovery process utilizing FRCP Rule 34.

Bridge common stock if it is not easily transferable or tradable publicly?"

208.    As a proximate cause of the U3 trading halt that has now lasted approximately 24 months, Plaintiff is damaged over approximately $400,000 and asserts his true damages in loss of use of that money, the calculation of dark pool/ATS trading share prices available on 7 to 9 December 2022, and other factors could lead to significantly higher damages at trial. 15 USCS 78u-4e provides for a 90 day window after "disclosure" to obtain a share price for compensation. Since the U3 halt only stopped trading on US lit markets, and evidence proves it was trading as late as June 2024 in foreign markets as high as $1039 a share, Plaintiff's true damages could be well over $50,000,000.

209.    After 9 December 2022, limit orders showing "too late to cancel" reflected shares were being placed for sale in a variety of brokers anywhere from under $100 to as high as $200,000 per share.

210.    Traudt had called TDA's 800-669-3900 account services number around 4:50pm EST on 20 March 2023 to inquire about tax paperwork that TDA had regarding Traudt's stock trading.

211.    Traudt remembers some confusion as to terminology in the conversation where Traudt asked about K2's and also other tax records and at all times on this date Traudt only spoke with Ron Fleming and was not transferred to anybody else. (Apparently his full name is Cameron Fleming, and he goes by Ron.)[14]

---

[14] Fleming held Type 6, 7, and 63 Series brokerage licenses on or about the time of his conversation with Traudt and was in a position to know the request to halt trading was made.

212.    After the tax issues were resolved, Traudt inquired broadly to Fleming about the MMTLP ticker which was apparently dead in the water as of 20 March 2023.

213.    Fleming seemed to Traudt that with some prodding he might discuss what he knew about the U3 halt of 9 December 2022 in MMTLP by FINRA.

214.    During the conversation, he made mention of three issues that Traudt thought clearly showed that trading was not shut down to protect small investors ("retail") but the broker dealers and potentially those shorting this:

215.    As Traudt recalled, Fleming stated that it [MMTLP] was "trading at 100 times the (lit market) in the dark pools and people were crazy to think broker-dealers would pay out on that."[15]

216.    The U3 was done, according to Fleming, "because the share price bore no relation to the actual share value" and…most importantly:

217.    *Fleming stated that "we had to protect ourselves" and that was why they requested the U3 halt.*

218.    Traudt  had requested to have copies of this conversation which was recorded by TDA sent to Plaintiff or made available for transcription.

219.    At first TDA said they would play them back, and then they refused, according to statements under oath in the *Traudt* civil case.

220.    Traudt attempted again in February of 2024 to get Schwab trade desk people to play them back, and they refused.

---

[15] Orders were staging at TDA reportedly in a wide range from $298 to almost $25,000, and clear evidence exists that TDA was accepting limit orders over $4,000 a share, meaning, conceivably, that MMTLP trading had detonated with a velocity akin to a nuclear weapon.

221.    Schwab will not release the audios clearly as part of a cover up and an orchestrated, coordinated campaign to prevent the release of damning information not only to Traudt but also to 65,000 other MMTLP shareholders similarly worked over by this "cartel" in all but name. Again, this shows the core monopolistic behavior by Schwab, and this refusal is more evidence of scienter.

222.    Schwab admitted to deleting Traudt's account records, emails, and the audios of the above Traudt-Fleming phone call on or about 16 September 2024 and did so even after Traudt had sent a demand letter for damages and notice of litigation on or about 29 December 2022 to Schwab via message center accounts at Schwab. (This should have served as a litigation hold on these electronically stored information ("ESI") items and also because SEC rules state that this data was to be preserved a minimum of 3 years anyway.) Clearly this confirms "scienter" by Schwab.

223.    This destruction of evidence also helps defendant FINRA because the core of *Traudt* and this instant matter is that they were all in a horizontal monopolistic relationship to profit from shorting MMTLP with the safety valve available in the U3 weapon that FINRA had.

224.    FINRA saw fraud as early as late November 2022 in MMTLP trading, and was not obligated to go forward with any Corporate Actions but it did on 6 and 8 December 2022

225.    GTS regularly *de facto* manipulates the market through the "market maker exemption" whereby a major market maker can create shares out of thin air with the stroke of a keyboard button and introduce them to the market or sell them off as part of a debt/equity swap to a hedge fund, bank, or other institution.

226.     SEC Rule SHO 201(b)(3) is often referred to as the "naked short exemption" for it allows a market maker – in this case, GTS – to short sale a stock without even having to "locate" such a share; on the barest of promises a market maker can naked short a stock, which is exactly how GTS and Rubinstein have provided the financial hammers to pound smaller companies into oblivion by relentless shorting with shares literally backed by nothing, created by a few keystrokes, loaned out in debt-equity swaps in the millions of dollars, and with FINRA enforcing the "locate at some point in time when you can get around to it" rules.[16]

227.     GTS has literally used this exemption for *trillions* of stock transactions.

228.     GTS  had superior knowledge, by virtue of its CEO Ari Rubenstein participating in the FINRA "Market Surveillance Group" and his intimate knowledge of the artificial intelligence/machine learning aspects of trading on the NYSE since 2017 that GTS knew how and where to bury the (financial) bodies. GTS provided unlimited shares for naked shorting to crush the price of MMTLP for the purpose of gaining illegal profits for the monopoly.

229.     FINRA nor the SEC has never audited GTS to identify if has been abusing SHO 201(b)(3) in MMTLP trading.

230.     GTS was hit by the New York Stock Exchange Regulatory Enforcement on 13 April 2023 for fines within a Letter of Acceptance, Waiver, and Consent ("LAWC"). More importantly, under the terms of the LAWC, the NYSE *still* has GTS under supervision with an embedded compliance officer that is to go on for 18 months due to the abuse of the TMS-45E machine algorithm/high frequency trading system ("HFT") within GTS. Since the start date for

---

[16] This is the ultimate financial "trust me bro" but it has horrific consequences for a free and fair market putting that much manipulative horsepower in market makers' hands and by extension, to a hedge fund or whale investor they do a quickie debt-equity swap with.

this supervision was 13 April 2023, it ostensibly ended on 4 October 2024.[17] GTS had numerous

activities in the past that could have been pursued criminally by the Securities and Exchange

Commission ("SEC") to include in particular predatory trading using high-speed algorithms that

saw it fined $10,000,000, and two employees fined $150,000 each.[18]

231.    On the last day of trading for MMTLP alone, GTS allowed short positions to be

opened in the amount of 15,000,000 shares alone, creating a vast field of failures-to-deliver in

pure Carl Sagan numbers.

232.    Upon information and belief, GTS is using GTS Systematic Equity Index Master

Fund LP (Ser # 805-2750972255) ("GTSSEIMF") to launder shares offshore. This is an ongoing

scheme.

233.    MMTLP continues to be traded post U3 in offshore markets hidden in FINRA

OTC-trading platforms, and GTS still plays a role, and GTS had motive, opportunity, and past

illegalities as proof that the corporate mindset is never about compliance but skirting or ignoring

regulations because of the complexity of catching them in fraud with their high-speed trading

systems.

234.    GTS provided counterfeit "long" shares to create huge oversold conditions at

Schwab and other brokers. It washed its own naked shorts using FINRA Rule 4560 to remove its

own short positions from its U.S. books in violation of anti-money laundering ("AML") statutes.

---

[17] Id 1§ 1.

[18] See *Letter of Acceptance, Waiver, and Consent No. 2019-07-00023 RE: GTS Securities LLC, Respondent* (13 April 2023); https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/ disciplinary-actions/2023/AWC_-_NYSE_Reg._No._2019-07-00023.pdf

235.     In 2020, GTS was fined by several exchanges a total of $70,000 to settle allegations of a failure to comply with certain regulations regarding short sale transactions.

236.     As noted previously herein, on 13 April 2023, GTS was fined $10,000,000 for the abuse of the TMS-45E machine algorithm/high frequency trading system ("HFT") within GTS. Two employees (Yaron Katz and Jinglei Zhou) were each fined $150,000 and GTS still has an SEC-mandated compliance officer embedded with GTS.

237.     In July-August 2020, the Overstock Squeeze took place under conditions similar to the MMTLP smash and grab by brokers and market makers. GTS played a role in getting the Overstock dividend trading illegally and without Overstock CEO Patrick Byrne's permission and (once again) the illegal trading was rubber stamped by FINRA. The OSTKO dividend – like MMTLP - was never supposed to trade. As in MMTLP, Georgetown University Prof. James Angel (an employee of Ari Rubenstein at the Modern Markets Initiative and under contract to the SEC for $600,000 with an IT deal with FINRA for his proprietary trading systems in "Intelligent Cross LLC") held himself out in both MMTLP and OSTKO as just a shareholder and launched attacks against company management. (At the time, Rubenstein was a member of the FINRA "Market Surveillance Advisory Group.")

238.     GTS and Rubenstein possess a Cayman Islands trading account (Ser # 5493003K4HST0B1TCP32) which upon information and belief is being used to transfer naked short positions on the books of GTS (USA) into the Cayman Islands to take advantage of FINRA Rule 4560 in furtherance of money laundering operations by GTS in violation of the Patriot Act, the Foreign Corrupt Practices Act, and the Bank Secrecy Act. The Cayman Islands have a well-

earned reputation as an excellent tourist destination for money laundering and hiding funds from the wildly myopic eyes of US regulators.

239.    GTS and Rubenstein have another fund in the Cayman Islands (Ser # 549300L8LDOXOXP8EB61) which lapsed as of 3 August 2023. Plaintiff suspects this was allowed to shutter because it dovetails with the SEC's compliance action against GTS on 13 April 2023, and there may have been things about this account GTS did not want its embedded compliance officer to have access to.

240.    GTS own a hedge fund GTS Systematic Equity Index Master Fund LP (Ser # 805-2750972255) that existed at the time of the MMTLP U3 halt and would have been a perfect vehicle to execute virtually unlimited short sales. Together with GTS, the two, upon information and belief, may have taken part in "spoofing operations" to drive the MMTLP share price to its peak ($12.26) on 22 November 2022 with a volume of 3.45 million shares.

241.    GTS has never done locates for any of the naked synthetics it provided for MMTLP as per Rule 203(b)(2), and thus the book is not closed "officially" on MMTLP; FINRA's CEO Robert Cook admitted on 31 January 2024 that there were still 2.65 million unclosed short positions in MMTLP indicating that MMTLP is not finished yet, legally.[19]

---

[19] Upon information and belief, the shorts in MMTLP may be over 900,000,000.

242.    GTS had "disclosures" with FINRA running the gamut from failure to train employees in anti-money laundering operations (AML) to abuses of the Rule 203(b)(2) failures to locate naked short shares it created.[20]

243.    FINRA would not disclose to former MMAT CEO Georgio Palikaras who had illegally got MMTLP trading. This is an excerpt from Palikaras' affidavit in another MMTLP related lawsuit in US District Court in Florida: "#20.  On or about October 14, 2021, Mr. Rice had a phone call with Ms. Casimates regarding META II's MMTLP complaint. During the call, Mr. Rice reported to me that FINRA refused to provide the identity of the broker(s) or individual(s) who applied for the exemption would not edit, delete, or modify the false and outdated Company information that was listed on the OTC Market's website."[21]– Georgio Palikaras, CEO.

244.    Put another way, five members of the UPC Committee had been issued almost 22% of the float of MMTLP.[22] This was more than a conflict of interest and the overwhelming

––––––––––––––––––

[20] In *Executive Summary of the Aggregate FINRA Broker Check Regulatory Events Data for GTS Securities LLC From February 3, 2011 to March 13, 2024* by Marcos Montiero, it is clear that even with embedded supervision pursuant to an SEC LAWC, GTS still manages to run afoul of trading regulations.

[21] Mr. Ken Rice was META's Chief Financial Officer; Ms. Patricia Casimates was FINRA's Vice-President for Market Operations for FINRA's Market Transparency Services. She was also identified numerous times by Sam Draddy in the FOIA-obtained emails Plaintiff seeks as part of this motion, and she sat on the FINRA UPC committee that used the U3 trade halt to nuke MMTLP trading on 9 December 2022.

[22] The exact float of MMTLP was 163,258,152 shares as of 9 December 2022 but NBH CEO gave himself another (roughly) 50,00,000 shares in return for a loan to NBH.

presence of counter-party interest violated a host of FINRA and the SEC's own rules, but suffice

to say 4.14(a) is the most pivotal in this instance:

245.    This was the original distribution of shares to the following corporate members of

the FINRA Uniform Practices Committee ("UPC") on or about 20 October 2021. The UPC

members are listed with their companies:

> Tom Nicholson, D.A. Davidson – 26,000
>
> Steven Paul Dapcic, Pershing LLC – 1,259,929
>
> Steven Paul Dapcic, The Bank of Mellon NY – 573,158[23]
>
> Kelly Bell, Hilltop Securities – 26,711
>
> Joseph Iraci, Robinhood – 12,804, 287
>
> Mathew Price, Fidelity Clearing Canada – 125
>
> Mathew Price, Nat'l Fin. Serv. LLC (Fidelity Div.) – 21,012,498[24]

246.    FINRA'S own rules at Sec. 4.14 state this conflict of interest was illegal: (a) A

Director or a committee member shall not directly or indirectly participate in any determinations

regarding the interests of any party if that Director or committee member has a conflict of

interest or bias, or if circumstances otherwise exist where his or her fairness might reasonably be

questioned. In any such case, the Director or committee member shall recuse himself or herself

or shall be disqualified in accordance with the Rules of the Corporation.[25]

247.    FINRA is in violation of its charter as it *trades* under the UTP Plan as OOTC

which is composed of numerous exchanges to include GTS Securities LLC's ("GTS") trading in

---

[23] Dapcic listed here twice as The Bank of Mellon NY owns Pershing LLC.

[24] Nat'l Fin. Srvcs. LLC is Fidelity's clearing arm.

[25] https://www.finra.org/rules-guidance/rulebooks/corporate-organization/conflicts-interest-contracts-and-transactions-0

this through its subsidiary NYSE ARCA. FINRA has commercial interests in trading.[26] Plaintiff posits that FINRA may have made a fortune off transactional fees in MMTLP alone.

248.    SEC Chair Gary Gensler and FINRA CEO Robert Cook (starting in May 2021) had numerous discussions about TRCH (to become the preferred dividend that would become MMTLP) knowing full well that the shares sold short and not closed out in TRCH prior to the merger transferred into MMTLP meaning the carried over shorts were staggering. These meetings are well documented in the publicly available daily schedule for Chairman Gensler.

249.    The US Congress never granted the SEC the authority to allow naked short selling and in fact, in passing the 2010 "Dodd-Frank Wall Street Reform and Consumer Protection Act" stated *unambiguously* that "it shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange to effect, alone or with one or more other persons, a manipulative short sale of any security. *The Commission shall issue such other rules as are necessary or appropriate to ensure that the appropriate enforcement options and remedies are available for violations of this subsection in the public interest or for the protection of investors.*"

250.    SHO 201(b)(3) is illegal and unconstitutional as written and *as applied* under *Loper:* "The purpose of statutory interpretation is to give effect to the will of Congress, not to create a new law that is not supported by the text." (Slip. Op. At 15).

---

[26] See *Trading Halts Amendments to the UTP Plan* at https://www.utpplan.com/DOC/
UTP_PlanAmendment50.pdf

251.    According to the Securities Exchange Act of 1934, Section 10(b): Schwab's failure to maintain accurate and complete records of Plaintiff's account, including the unauthorized sale to Plaintiff of counterfeit shares constituted fraud.

252.    According to the Securities Exchange Act of 1934, Section 10(a)(2): Schwab's failure to disclose material information to Plaintiff, including the existence of counterfeit shares in Plaintiff's account was a separate violation distinct from 10(b).

253.    According to the Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5: Schwab aided and abetted the fraud against Plaintiff by allowing the unauthorized sale of counterfeit shares and failing to prevent the fraud.

254.    Since both GTS and Schwab knew or should have known that naked shorts (counterfeit shares, essentially) were now running into potentially the hundreds of millions by 3 November 2022,  Schwab knowingly traded in counterfeit shares by electronically transferring them into Plaintiff's account without Plaintiff's knowledge on or about 30 November 2022.

255.    GTS distributed naked short shares that were fictional and never located and did so causing cascading system failure throughout the trading in MMTLP by creating a digital "false flag" operation (this has been done in numerous other stock tickers such as AMC and GME) completely depressing the share price of MMTLP but having the adverse effect to shorters of creating the proven potential for a short squeeze.[27]

_____

[27] A short squeeze is when people who have "borrowed" a security hoping it will then lose value to be able to "sell" that security later and net the difference as untaxable profits get caught with their pants down as a security instead gains value forcing  a "squeeze" on available shares and a rapidly increasing share price for "long" position holders as the short borrowers attempt to "cover" their losses quickly before, as Warren Buffet observed: "Their losses can become infinite" due to the unavailability of shares to be bought to address the imbalance in the market.

256.    FINRA CEO Cook stated "FINRA cannot perform a 'certified audited and consolidated count of shares.' FINRA's regulatory authority does not extend to domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers. Further, the regulatory tools available to FINRA do not provide the data that would enable FINRA to perform a share count (e.g. the Consolidated Audit Trail, Electronic Blue Sheets, and FINRA's trade reporting facilities do not contain information about securities *positions* [emphasis not added].[28]

257.    Cook knew or should have known that the above statement (#256) was false, and that all FINRA had to do was check DTCC and NYSE trading records for the OITC-UTC owned and operated by FINRA to get accurate numbers.

258.    FINRA reported in Cook's letter to Rep. Norman that there were "only" 2,650,000 short shares not "closed out" in financial language meaning: those who had sold it short did not have to fulfill their financial obligations and were able to pocket millions of dollars because FINRA, with the U3 halt, prevented them from having to "buy to close" per FINRA Rule 204 that mandates that all shorts must close out positions.

259.    FINRA admitted via Cook in that same letter that they were absolutely clueless when it came to shares sold into what a lay person might call the "shadow realm" of stock trading: alternative trading systems (ATS), offshore broker-dealers who had no obligations to

---

[28] 31 January 2024 Cook letter to Rep. Ralph Norman.

report, non-reporting transferees; basically a witches' brew of electronic data black holes that FINRA then plead ignorance of in regulating.[29]

260.    Any claims by Cook and FINRA of there being a "not significant" 2,650,000 shares not covered are a fiction designed to placate outraged MMTLP shareholders and Congress.

261.    NBH corporate officers reported to FINRA that on or about 19 January 2023 that they were approached by two representatives of short sellers to buy a significant amount of shares to close out their short positions that were unable to close on  9 December and 12 December 2022.

262.    NBH received information and disclosed on 21 November 2023 that financial firms had reported to them that short shares "may be significantly higher" than what FINRA was reporting.

263.    Another broker-dealer trading in MMTLP (TradeStation) reported on 21 February 2023 that: "At this time TradeStation has sent the majority of its original certificated shares to AST to be held on their books. There are a de minimis amount of shares remaining in the current certificate and therefore new requests cannot be accepted until a time when TradeStation receives any new certificates of owned shares or NBH becomes tradable in the open market or made electronically available…due to the physical certificate being produced as of a specific record

---

[29] In and of itself, this admission begs the question: what does FINRA *actually* do? And the follow on: if they can wash their hands of their supposed role "protecting small investors" by flat out not even trying to get a share count in MMTLP by calling all the broker-dealers and asking simply – as far as Plaintiff knows, phones still work – what were your sales of this stock? What were your buys in this stock..? How many unclosed short positions do you have..? Then they are nothing more than monopoly participants and players.

date position and fully paid loans being active on that record date, *TradeStation was allocated less shares than the firm's overall customer position…*"

264.    TradeStation admitted to being oversold in MMTLP per the above referenced admission against interest.

265.    FINRA has thus far declined to investigate this oversold condition, which is apparently well documented in other broker-dealers who traded in MMTLP besides TradeStation.

266.    MMTLP and MMAT illegally shared the same Central Index Key (CIK) number (1431959) used by the Securities and Exchange Commission (SEC) and FINRA as a unique intra-system identifier. This unusual and rule breaking sharing of the CIK number pertaining to CIK number 1431959 and the related stocks, MMTLP and MMAT was then made even more obviously conspiratorial by FINRA as of 24 April 2024 FINRA has overseen the issuance of the former Torchlight Energy Resources Inc. "CUSIP number" (89102U103) to a new security ("Bitech Technologies Corporation") for trading.[30] *In doing so, it has chosen to contaminate the trading records to include the Trade Reporting Facility (TRF) data regarding TRCH, Consolidated Audit Trail (CAT) data, CNS accounting summaries, and a plethora of other data combines through this deliberate act of evidence destruction*. The destruction, alteration, or spoliation of this evidence would severely prejudice the Plaintiff's case and could impede a

---

[30] The CUSIP number, as defined by FINRA (Financial Industry Regulatory Authority), is a unique identifier assigned to securities, including stocks, bonds, and mutual funds, in the United States and Canada. CUSIP stands for "Committee on Uniform Securities Identification Procedures." The CUSIP number is a nine-character alphanumeric code that helps to uniquely identify a specific security for the purpose of facilitating clearing and settlement of trades.

potential criminal investigation.[31]

267.    Upon information and belief, TDA (basically a business unit of Schwab at that juncture) is oversold in MMTLP to date over its initial allotment of 53,000,000 shares by at least 110,000,000 shares and potentially significantly more. This number does not include short positions it was saved from closing out by the U3 halt of 9 December 2022.

268.    On 8 December 2022, there were at least 15,402,238 shares short that *never closed* on that day alone, in MMTLP. Schwab loaned 6.4 million shares on 8 December 2022 and they were never closed out.

269.     Traudt asked in writing  Schwab (who now owns TDA) on 26 June 2024 if Schwab was in an oversold condition in MMTLP and Schwab has refused to answer Traudt.

270.    Upon information and belief, Schwab is oversold in MMTLP to date over its initial allotment of 12,000,000 shares by at least 60,000,000 shares. This number does not include short positions it was saved from closing out by the U3 halt of 9 December 2022.

271.    Hilltop Securities (hereinafter "Hilltop") traded in an omnibus account via Schwab and Kelly Bell (hereinafter "Bell"), Hilltop's Managing Director (and conveniently positioned on the U3 halt board at FINRA)  was forced to disclose that Hilltop was in a badly oversold position (through Schwab) at the time of the U3 halt in trading in MMTLP.[32]

---

[31] TRCH's unique CUSIP number is especially relevant here due to the fact that it was TRCH's unclosed out short positions that carried over from its conversion to MMTLP in October, 2021.

[32] Hilltop was fined $475,000 for regulatory failures in 2019-2020 yet managed to get a seat on the U3 board that halted MMTLP.

272.    Tiger Global (hereinafter "Tiger"), an overseas broker-dealer, was oversold and/or needed to cover open short positions in MMTLP and was so desperate to do so it falsified and released a PR on 8 August 2023 stating that NBH had released a tender to buy back MMTLP shares and that Tiger clients could sell their shares to Tiger.[33]

273.    NBH never authorized this tender.

274.    TDA and Schwab clients attempted to transfer their former MMTLP shares from CUSIP number to NBH using the American Stock Transfer & Trust Company (hereinafter "AST") which was the designated operation to insure shares were converted as part of the 1:1 transfer identified in MMAT's S-1 approved by FINRA. Some were able to, some were not. There is a share imbalance easily provable at AST/EQ by one third party subpoena.

275.    On or about 22 July 2023 MMTLP shareholder Alexander Yon (hereinafter "Yon") sent a FOIA request to the SEC requesting emails and data traffic in the SEC's files concerning MMAT, TRCH, and MMTLP.

276.    Yon received an acknowledgement from the SEC on 24 July 2023.

277.    Yon was told in correspondence on 30 November 2023 from the SEC that the first 100 pages of his FOIA request would be free, but that there would be service fees from the SEC's FOIA processing US government contractor at a processing rate of 50 pages an hour that would run from $29 to 89 an hour.

---

[33] Tiger Global was trading MMTLP as TRCHN in Singapore markets in 2024 at as high as $1039 a share.

278.     Yon notices the SEC FOIA processing personnel keep searching for bastardized versions of "TRCH, "MMAT," and "MMTLP" further delaying the process and adding additional costs.

279.     The SEC's contractor conducted a search for Yon's requested information directly and specifically pertaining to emails and files relating to MMTLP and was informed his request *identified a breathtaking 636,000 separate documents*.

280.     The 636,000 pages would stack 200 feet tall if printed on standard 8.5inch x 11 inch printer paper.

281.     In order for Yon to get to the truth in the MMTLP matter, the financial math and billing provided by the SEC resulted in a staggering, US Constitutionally impermissible, insane $368,880 "research" tab (computed as 12,720 hours x $29 an hour minimum), to be followed by $95,000 in printing fees at 0.15 cents per page.

282.     Yon offered four separate payments to get this information and the SEC accepted it.

283.     Yon's requests were denied *in toto* on 7 February 2024 by the SEC, denied his appeal, closed his case, then took measures to prevent him from accessing the SEC site, which in and of itself is *prima facie* evidence of malicious intent and conduct at variance with the SEC's grant of authority under the Securities Act of 1934.

284.     There were at least 246 FOIA requests filed by MMTLP shareholders and one filed by a US Congressman. One of the  only ones answered produced the aforementioned Draddy emails. That is a breathtaking 99.59% failure to disclose rate.

285.    Yon returned to the SEC (there are now as of 15 July 2024 proven 246 FOIA requests for emails and documents associated with the MMTLP U3 halt, trading, and other matters) log page and after review discovered that his entire FOIA history of requests was expunged.

286.    Upon information and belief, Plaintiff believes the SEC has orchestrated a campaign to minimize or suppress the true extent of FOIA requests it has illegally denied in coordination with and consistent with a pattern of monopolistic concealment conducted by FINRA, GTS, Rubenstein, and Schwab in concealing the full extent of the insider trading, fraud, and counterfeiting that occurred in the short OTC lifespan of MMTLP.

287.    In responding to a 16 August 2022 FOIA request, the SEC stated they could find no 15c-211 form for the registration to trade MMTLP.

288.    On or about 27 June 2024 Traudt sent questions via email to Schwab customer service requesting Schwab's FINRA Form 211's allowing them to trade MMTLP and also for Schwab to confirm or deny if they oversold shares in MMTLP. To date these questions, and others have not been answered in violation of FINRA Rules 2010 (commercial honor) and 4512 (customer account information records to be maintained. Plaintiff contends that that obligation extends into the chain of custody for information regarding any and all securities Plaintiff purchased.)

289.    The Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) ("PSLRA") was created as law by Congress in 1995 ostensibly to prevent frivolous lawsuits.

290.    The PSLRA's main components are heightened pleading standards for securities plaintiffs as private parties, a heightened "scienter" requirement, a stoppage of any discovery by

plaintiffs until motions to dismiss have been heard and decided, and the plaintiffs must state with exacting specificity each and every misleading statement by defendants.

291.    Plaintiff contends that the PSLRA is unconstitutional as applied and in practice under the 1st, 5th, and 14th Amendments to the US Constitution and also under the Appointments Clause at Article 2 § 2. as it creates a two-tiered legal system completely crippling the smaller investors and thus is violative of the 5th Amendment's Equal Protection Clause and the 1st Amendment's right to petition for redress of grievances (in court if necessary.)

292.    Plaintiff also argues that it is a clear encroachment on the separation of powers as Congress set the bar far too restrictively against an already disadvantaged class (small retail investors) who cannot have the same resources as the leviathans the law actually protects, and in doing so precludes the disadvantaged class from pursuing recovery for damages from members of the financial community with long histories in fraud and routine market regulation violations.

293.    In short, PSLRA was implemented to cover up and conceal fraud on an industrial scale. More importantly, Plaintiff does maintain here that were all of the foregoing not enough, technological advances in trading systems available to market makers, hedge funds, and brokers have now brought an overwhelming technological advantage that further insures there is no level playing field at all for small investors: modern trading technology has dramatically shifted the landscape, and retail investors often find themselves at a significant disadvantage compared to institutional players using AI, high-frequency trading (HFT), order internalization, and payment for order flow (PFOF).

294.    These all constitute grounds for an "as applied" challenge to the application of PSLRA in any situation involving small investors trying to recover in securities fraud, insider

trading, reliance, fraud-upon-the-market, etc.; all of the following technologies existed have

increased in power exponentially since 1995 when the PSLRA was enacted, and all have been

used *routinely* to brutalize small investors: High-Frequency Trading (HFT) firms use

sophisticated algorithms to trade thousands of shares in milliseconds, making decisions faster

than human perception allows. This gives them a massive edge over retail investors.

295.    Using latency arbitrage systems coupled with AI, HFT traders exploit small price

discrepancies in various exchanges and quickly buy or sell shares before the retail investor's

trade can even execute. By the time a retail investor's trade goes through, prices may have

shifted, leaving them with a worse price.

296.    With flash orders and dark pools, some HFT firms pay for access to "flash orders"

(i.e., seeing orders milliseconds before the public). This gives them the ability to front-run trades,

further eroding the ability of retail traders to get fair execution.

297.    HFT firms sometimes enter markets just to create the *illusion* of liquidity

(liquidity removal) and then pull orders when they sense a price change, leaving retail traders

unable to get filled on orders, or worse, buying into a price spike created by HFT tactics.

298.    AI and algorithmic trading allow institutional players increasing use of AI-driven

algorithms that can process enormous datasets in real-time, including market sentiment analysis

where AI algorithms scrape social media, news, and other public sentiment data to predict stock

price movements before the retail crowd catches on. Retail investors, relying on delayed or

incomplete information, simply can't compete with these AI-powered predictions.

299.    With pattern recognition and back testing, AI systems analyze historical data to

find patterns invisible to human traders. These algorithms can adjust to micro-market conditions,

78

tweaking strategies in real-time, something retail investors could never match manually. The gap between institutional and retail access to AI tools leads to a significant imbalance, with retail traders effectively gambling in an arena where institutional players can see around corners.

300.    Order internalization refers to how brokers like Robinhood or Schwab fill their customers' orders internally or route them to market makers, who may not give the best execution. Here's why it matters: retail orders are considered an "asset" by brokers and market makers and are also considered "dumb flow" because they're seen as less informed compared to institutional orders. Market makers that internalize these orders can take the other side of the trade, knowing they are up against less sophisticated traders. This can result in price slippage or suboptimal fills for retail trades. When too many orders are internalized, price discovery becomes distorted because the public market doesn't get to see the true depth of buy and sell interest. This can push retail traders into unfair pricing environments. This is known as "distorted price discovery."

301.    Payment for order flow (PFOF) is the practice where brokerages sell their clients' order flow to market makers. This has led to concerns about conflicts of interest because retail traders/investors do not get the best execution for their trades despite what brokers like Schwab contract to do in their client agreements and generally the best execution is sacrificed for profit. When brokers receive payment to route trades to certain market makers, they are incentivized to send trades to the highest-paying market maker rather than the one that would offer the best execution. Retail traders often think they're getting free trades, but they end up paying in the form of worse prices.

302.    Latency disadvantages occur by routing retail orders through these channels, institutional market makers can front-run or trade against retail orders. This is made worse by the fact that retail orders are often delayed, while HFT firms can exploit these delays. Dark pools – no coincidence here – became able to process voluminous hidden trades (starting in 1998, essentially, when computer firepower began to effect dramatic market changes) by major market participants (hedge funds, market makers, brokerages) as institutional players had access to these private exchanges where large orders can be executed without affecting the public price of a stock. Retail traders don't have access to them which insures here is no price transparency for retail traders as there is no access to supply and demand numbers (this is an ongoing "fraud-upon-the-market" made possible by the PSLRA as access to trading data in the dark pools is prohibited to retail traders).

303.    Market fragmentation is another example of retail investor abuse and disadvantage: with trades happening across numerous exchanges and dark pools, retail investors can't get a full picture of the market. While HFT firms thrive in this fragmented environment by exploiting differences between venues, retail traders are left confused or stuck with slower order fills that are exacerbated by bid-ask spread and speed disadvantages: retail investors generally suffer from worse bid-ask spreads, and without the tools for ultra-fast execution, they are vulnerable to wider spreads in the prices of securities. Market makers widen spreads for retail orders compared to institutional ones, meaning that retail investors are paying more to buy and getting less to sell. Even though brokers like Robinhood offer "free" trades, the reality is that the execution delay (even by milliseconds) can result in price slippage that harms the retail investor.

In contrast, institutions benefit from near-instantaneous execution at better prices due to superior access to liquidity.

304.    Institutions create synthetic financial products or leverage options, while retail traders get access only to the less sophisticated or high-risk versions; for example, hedge funds and institutions can trade in derivatives that allow them to hedge or manipulate market conditions, while retail investors might only have access to highly risky leveraged products without understanding the complexities involved, which leads inevitably to a much higher risk exposure for retail traders as they often end up overexposed to risky strategies due to the availability of leveraged products, without the algorithms or tools to manage that risk. Meanwhile, institutional players use these products in conjunction with risk-management AI to capitalize on volatility.

305.    Regulatory arbitrage describes the wild advantages institutions use in loopholes in regulations or even regulatory capture to manipulate markets to their advantage such as Regulation SHO and Naked Shorting as institutions can exploit loopholes in regulations  to conduct naked shorting, which undermines price discovery and can disproportionately hurt retail traders who believe in the underlying fundamentals of a stock.

306.    As seen in spades in *Northwest Biotherapeutics, Inc. v. Cannacord Genuity et. al.* CANO: 1:22-cv-10185-GHW-GS, all of the super predators/market makers (GTS sued for spoofing)  were routinely proven to have employed spoofing algorithms to destroy the share price of company by placing trades only designed to crush the stock price to the visible market, sometimes making and cancelling trades in milliseconds. The inescapable conclusion is that the

PSLRA is now unconstitutional by virtue of the technological advances that create and sustain an embedded, stratified, class-based discriminatory market system.

## FACTS 1 THROUGH 306 ALL INCORPORATED IN THE FOLLOWING COUNTS BY REFERENCE AND MADE A PART THEREOF

## COUNT I (FINRA): VIOLATION OF SECURITIES EXCHANGE ACT RULE 10b-5 (Insider Trading – 15 USCS 78t-1(a))

307.    At all relevant times, FINRA had access to material non-public information regarding the trading of MMTLP in which Plaintiff held a financial interest.

308.    FINRA, either directly or through its agents, engaged in disseminating information in the blue sheets for MMTLP not available to the trading public and did so for the specific benefit of at least 6 of the members of the UPC Board that halted MMTLP trading on 9 December 2024 in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

309.    FINRA's insider trading lead to the Schwab requested trading halt that destroyed the value of Plaintiff's MMTLP shares resulting in financial loss to Plaintiff.

310.    As a direct and proximate result of FINRA's unlawful insider trading, Plaintiff suffered damages, including but not limited to the devaluation of securities, lost investment opportunities, and consequential losses.

## COUNT II (FINRA): VIOLATION OF SECTION 9(a)(2) OF THE SECURITIES EXCHANGE ACT (Market Manipulation – 15 USCS 78i(f))

311.    At all relevant times, FINRA, in its role as a self-regulatory organization, engaged in practices that were designed to manipulate the market for MMTLP securities.

312.    Specifically, FINRA colluded with market makers and brokers to artificially control the price of MMTLP and allowed naked synthetic short shares to enter the market destroying the MMTLP price. FINRA did not ever force GTS to do a locate on the naked synthetics it created. FINRA knew there were problems with MMTLP shorts from at least October 2021 to the present. This was done creating a false impression of market activity and distorting price discovery.

313.    FINRA's conduct violated Section 9(a)(2) of the Securities Exchange Act of 1934, which prohibits the creation of an artificial price level or the appearance of active trading when such activity is not reflective of the actual market but instead an artificial construct allowed certain market makers.

314.    As a direct and proximate result of FINRA's market manipulation, Plaintiff suffered damages, including the devaluation of securities and the loss of investment returns.

## COUNT III (FINRA): CLAYTON ACT CLAIM FOR DAMAGES UNDER SECTION 4 (15 U.S.C. § 15)

315.    This claim arises under Section 4 of the Clayton Act (15 U.S.C. § 15), which provides for the recovery of treble damages, costs, and attorney's fees for injuries caused by antitrust violations. Defendant FINRA has engaged in monopolistic operations in collaboration with Schwab. Through its regulatory practices, trading halts, and selective enforcement of rules, FINRA has facilitated:

- Market manipulation and price suppression by allowing market makers to create and conceal naked short positions in securities such as MMTLP, directly harming Plaintiff's investments.

- Frustration of price discovery by failing to enforce transparency rules under Regulation SHO and enabling brokers to hide short positions through FINRA Rule 4560.

- Collusive activities between FINRA and hedge funds, brokers, and market makers that foreclose small investors like Plaintiff from participating in fair markets.

316.   FINRA's monopoly over arbitration, broker-dealer membership as a condition to conducting commerce in securities,  and dispute resolution, tied through brokers like Schwab, has deprived investors of access to the courts, forcing reliance on a system that shields FINRA and its market participants from accountability.

317.   FINRA's conduct has created anti-competitive market conditions, allowing brokers, market makers, and hedge funds to operate without transparency or meaningful oversight, to the detriment of Plaintiff and other small investors.

318.   As a direct and proximate result of Defendant's unlawful monopolistic operations, Plaintiff has suffered significant financial harm, including:

319.   Loss of the value of MMTLP shares due to the U3 trading halt.

320.   Financial injury from the artificial manipulation of share prices through undisclosed short positions.

321.   Ongoing harm resulting from exclusion from fair and open markets.

## COUNT IV(FINRA): VIOLATION OF SEC RULE 10b-5 – RELIANCE ON THE INTEGRITY OF THE MARKET (15 USCS 78j(b))

322.     This claim arises under SEC Rule 10b-5, which prohibits any act, practice, or course of business that operates as a fraud or deceit upon any person in connection with the purchase or sale of securities. FINRA, through its improper conduct, including the U3 halt of MMTLP trading, manipulation of short position data, and failure to enforce Regulation SHO, facilitated market practices that deceived investors. Specifically, FINRA's actions and omissions created the false appearance of a fair and transparent market, upon which Plaintiff reasonably relied.

323.     Plaintiff relied on the integrity of the market, assuming that all trading activity in MMTLP and other securities was conducted in accordance with the rules and regulations governing securities markets. This reliance is consistent with the fraud-on-the-market theory, which presumes that the prices of publicly traded securities reflect all material information.

324.     FINRA's facilitation of naked short selling, concealment of short positions under Rule 4560, and capacity to (scienter herein) releasing altered Corporate Actions was unknown to Plaintiff and misled Plaintiff into believing that he was trading in a fair and lawful market environment. This reliance was reasonable given FINRA's role as a regulator tasked with ensuring market integrity.

325.     As a direct and proximate result of FINRA's conduct, Plaintiff suffered significant financial harm, including:

a. Loss of value of MMTLP shares to zero.

b. Prevention of being able to trade, manage, or liquidate positions in MMTLP due to the illegal U3 halt.

c. Reliance on distorted market information, leading to Plaintiff's losses.

## V: (FINRA) ACTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### 1st Issue:  Violation of the Separation of Powers - Improper Exercise of Executive Power

326.    Plaintiff hereby incorporates all FACTS 1 through 306.

327.    The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

328.    As set forth above, FINRA exercises wide-ranging executive power, including the power to suspend trading in securities at will, to "enforce compliance" with the Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

329.    FINRA's wide-ranging exercise of executive or administrative power is immune from Presidential supervision or control. FINRA's Board of Governors are not appointed or removable by the President; rather, they are selected by FINRA's members.

330.    Even the SEC has limited authority review of FINRA's actions. The SEC may remove FINRA's Board of Governors only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

331.    FINRA's exercise of wide-ranging, core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives. As a result, the creation of FINRA, as well as its implementation of its delegated responsibilities by the SEC and the Maloney Act, violates the separation of powers.

### 2nd Issue:  Violation of the Appointments Clause of the U.S. Constitution

332.    FINRA is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

333.    Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board of Governors exercise significant authority pursuant to the laws of the United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

334.    The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

335.    By virtue of the wide-ranging discretion, duties, functions and independence of the FINRA Board, members of the Board are principal officers whose appointments must be made

by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

336.    In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board by its membership violates the Appointments Clause.

### 3rd Issue: Unconstitutional delegation

337.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

338.    By virtue of the grant of wide-ranging authority the SEC delegated to the FINRA Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch. This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.

### PRAYER FOR RELIEF - DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

**WHEREFORE,** Plaintiff prays for the following relief:

1. An order and judgment declaring unconstitutional the provisions of law empowering FINRA to enforce compliance with the securities laws;

2. An order and judgment enjoining FINRA from carrying out any of the powers delegated to them by Congress or the SEC;

3. An order and judgment pursuant to 28 U.S.C. § 2201, 2202 declaring that FINRA is presently constituted and operating in a manner that violates the separation of powers set forth in the

88

Article I of the Constitution;

4. An order and judgment pursuant to 28 U.S.C. 8§ 2201, 2202 declaring that FINRA, in its exercise of disciplinary functions, is a state actor and subject to the obligation to respect the rights guaranteed under the Unites States Constitution;

5. An order of this Court finding that the U3 trade halt issued by FINRA was *ultra vires* and illegal.

6. An injunction immediately against FINRA continuing to execute operations using Rule 4560 or Rule 203(b)(2) and ordering FINRA to cease allowing the movement of shares held short to overseas affiliates of US companies or individuals trading in the US stock market.

7. Costs and attorneys' fees pursuant to any applicable statute or authority;

8. Such further relief as this Court deems just and appropriate.

## VI (UNITED STATES OF AMERICA): ACTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF FINDING THE PRIVATE SECURITIES LITIGATION REFORM ACT (15 U.S.C. § 78u-4) UNCONSITUTIONAL AS APPLIED 1st ISSUE: SEPARATION OF POWERS

339.    Plaintiff incorporates all preceding FACTS 1 through 306 by reference and asserts that the Private Securities Litigation Reform Act of 1995 ("PSLRA") is unconstitutional on multiple grounds, necessitating its invalidation and an injunction against its continued enforcement.

340.    The PSLRA infringes upon the separation of powers doctrine by imposing judicially enforceable pleading standards that substantially restrict the judiciary's ability to adjudicate securities fraud cases. Congress's mandate under the PSLRA, particularly its requirements for heightened pleading under Rule 9(b) and its stay of discovery provisions,

undermines the inherent authority of courts to manage litigation and apply well-established procedural rules. By dictating the evidentiary and procedural burdens in a manner that subverts the judiciary's traditional role, the PSLRA constitutes an impermissible legislative intrusion into judicial functions, thereby violating the separation of powers.

## 2ND ISSUE: 1ST, 4TH, AND 15TH AMENDMENT VIOLATIONS

341.    Plaintiff incorporates all preceding paragraphs by reference.

342.    The PSLRA's stringent pleading requirements also violate the First Amendment by chilling access to the courts. The Act's requirement that plaintiffs plead fraud with particularity, coupled with its heightened scienter requirement, creates a nearly insurmountable barrier for aggrieved investors, particularly those lacking access to evidence locked within the control of defendants. This restriction effectively denies individuals their right to petition the government for redress of grievances, as guaranteed by the First Amendment. Courts have long recognized that access to the judicial process is a core constitutional right, and the PSLRA's framework undermines this principle by foreclosing meritorious claims at the pleading stage.

343.    Moreover, the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors while shielding institutional actors from accountability. By raising the barriers to bringing securities fraud claims, the Act insulates powerful corporate entities, such as broker-dealers, market makers, and large institutional shareholders, from scrutiny. This disparate impact results in a two-tiered system of justice, favoring well-resourced defendants and disadvantaging retail investors, contrary to the principles of equal protection and fundamental fairness.

344.    The PSLRA also contravenes the Due Process Clause of the Fifth Amendment by effectively denying plaintiffs the opportunity to prove their claims. The Act's stay of discovery provision prevents plaintiffs from obtaining the evidence necessary to meet the heightened pleading standards, creating a procedural Catch-22. Plaintiffs are required to plead with specificity facts that are often exclusively within the defendants' knowledge, yet they are barred from accessing discovery until they survive the very pleading standards that require such evidence. This structure deprives plaintiffs of their right to a meaningful opportunity to be heard, a core guarantee of due process.

345.    Additionally, the PSLRA violates the Equal Protection Clause of the Fourteenth Amendment, particularly as it applies to state-law securities fraud claims. By effectively preempting state-law remedies and imposing federal standards that favor corporate defendants, the PSLRA denies state plaintiffs equal protection under the law. This disparate treatment between federal and state claims creates a de facto barrier to justice for those seeking redress in state courts. The Constitution guarantees that all individuals, irrespective of jurisdictional distinctions, are entitled to equal protection under the law. The PSLRA disrupts this balance by disproportionately favoring powerful financial entities while undermining the ability of individual investors to pursue justice in state forums.

346.    Furthermore, the PSLRA's safe harbor provision for forward-looking statements enables corporate malfeasance and undermines the deterrent effect of securities laws. By granting near-immunity to companies that issue misleading or false forward-looking statements, the PSLRA incentivizes fraudulent conduct and weakens the regulatory framework designed to ensure market integrity. This provision constitutes a legislative overreach that disrupts the

balance between investor protection and corporate accountability, contrary to the broader purposes of federal securities laws.

347.    Additionally, the PSLRA's legislative history demonstrates that it was enacted under substantial lobbying pressure from industry groups, raising concerns about regulatory capture. The Act's provisions reflect a bias toward protecting corporate defendants at the expense of retail investors, evidencing an abdication of Congress's duty to serve the public interest. By prioritizing the interests of powerful financial entities over those of individual investors, the PSLRA violates the public trust and undermines confidence in the judicial and regulatory systems.

348.    The Act also conflicts with the principle of judicial economy. By requiring plaintiffs to meet heightened pleading standards without access to discovery, the PSLRA increases the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss based on incomplete records, leading to inefficiencies and increased costs for all parties. This undermines the purpose of federal procedural rules, which are designed to promote the just, speedy, and inexpensive resolution of disputes.

349.    Finally, the PSLRA's limitations on joint and several liability for defendants exacerbate the harm to investors and weaken deterrence. By restricting liability to a proportional basis, the Act shields culpable parties who engage in fraudulent schemes in concert with others. This provision undermines the deterrent effect of securities laws and leaves victims of fraud inadequately compensated for their losses.

**WHEREFORE:**

For these reasons, Plaintiff seeks declaratory relief declaring the PSLRA unconstitutional in its entirety and injunctive relief prohibiting its enforcement. The Act's provisions conflict with fundamental constitutional principles and should be struck down to preserve the rights of investors and maintain the integrity of the judicial system.

## PRAYER FOR RELIEF

Plaintiff asks this court to:

1. Declare the PSLRA unconstitutional in whole or in part.

2. Provide injunctive relief in the immediate suspension of enforcement of the PSLRA.

## COUNT VII (NBH): VIOLATION OF SECTION 11 OF THE SECURITIES ACT AGAINST DEFENDANT NBH AND MCCABE

350.    Plaintiff repeats and incorporates FACTS 1 through 306 and incorporates them here by reference as if fully set forth within each and every allegation contained above as if fully set forth herein.

351.    This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against all Defendants NBH and McCabe.

352.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

353.    The Defendants are strictly liable to Plaintiff  for the misstatements and omissions.

354.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

355.    By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, Section 11 of the Securities Act.

356.    Plaintiff acquired NBH shares pursuant and/or traceable to the Registration Statement.

357.    Plaintiff has sustained damages.

358.    When he acquired his NBH shares, Plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT VIII (NBH AND BRDA): VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

359.    Plaintiff repeats and incorporates FACTS 1 through 306 and incorporates them here by reference as if fully set forth within each and every allegation contained above as if fully set forth herein.

360.    This count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2) against NBH and Brda.

94

361.    NBH and Brda offered and/or sold securities pursuant to the Registration Statement, which included a prospectus containing untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

362.    NBH was the issuer of the securities being offered and/or sold pursuant to the Registration Statement.

363.    Brda is a "statutory seller" of the securities being offered and/or sold pursuant to the Registration Statement.

364.    Prior to and following the announcement of Torchlight's merger with Metamaterial, Brda promoted NBH through *inter alia* private communications with select investors and third-party consultants, whom he instructed and intended to use to promote NBH to public retail investors. Brda also made promotional claims about NBH and its O&G Assets in Torchlight's public filings and proxy statements. Brda's promotional claims about NBH created demand for NBH's securities among retail investors which, in turn, allowed Torchlight to sell 16.2 million shares of stock to investors and raise approximately $137.5 million. Brda then used these funds to pay himself (through the post-merger company, Meta Materials) a $1.5 million bonus.

365.    Brda further promoted the preferred stock when, for example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and preferred dividend. Brda referred to these consultants in conversations with Palikaras as his "guys on stock support." Brda caused Torchlight to pay the stock-support consultants $3,000 to

$5,000 per month plus stock warrants for their services. As reflected in the below exchange, Brda instructed the consultants on how they should message the dividend to investors:

Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
Brda: I think people don't understand the dividend properly.
Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

366.    Beginning in December 2020, Brda circulated to McCabe, who was Torchlight's Chairman at the time, presentations outlining capital formation plans for a spin-off entity, *i.e.*, NBH. At the same time, Brda continued issuing additional press releases emphasizing the dividend and preferred stock, including but not limited to an announcement dated December 14, 2020, highlighting in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing."

367.    Starting in January 2021, Brda caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the spin-off entity, *i.e.*, NBH. Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. Brda did not publicly disclose these payments or his plans for the spin-off entity. At the same time, Brda continued promoting the preferred stock by *inter alia* emailing information about the outstanding short position in Torchlight to the stock- support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other

communications, Brda prompted Torchlight's consultants to explain the preferred dividend and its impact on short sellers to investors.

368.   Brda used social media influencers under his control to create an artificial demand for first TRCH shares and then MMTLP shares from June 2021 to December 2022.

369.   Brda sold shares when he maintained he did not.

370.   Brda paid the $20,000 to "consultants" through illegal 3rd party cut outs using TRCH funds.

371.   Plaintiff was damaged by Brda's and NBH's falsities, the payment of stock promoters that was never disclosed publicly, and for the overall scheme.

372.   NBH and Brda made materially false and misleading statements not only though their prospectus and other documents but also by the use of other parties to promote the fraud in the stock to Plaintiff.

<u>**DAMAGES**</u>

<u>**PRAYER FOR RELIEF**</u>

Plaintiff requests of this court the following:

1. Reasonable attorney's fees.

2. Treble damages for all Clayton Act claims.

3. Compensatory damages of $5,000,000, costs, and punitive damages if allowed by this Court against Defendant FINRA.

4. That the Declaratory Judgment and Injunctive Relief be granted against FINRA.

5. That the Declaratory Judgment and Relief be granted against United States of America.

6. Awarding damages pursuant to Section 11 of the Securities Act.

7. Awarding equitable relief if the Court deems it necessary and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby claims and demands a trial by jury on all counts and portions of this complaint

that are so triable.

Dated: December  __26__, 2024              <u>Brad Davis Pro Se electronic signature</u>
                                          Brad Davis, *pro se ipso*
                                          4771 Sweetwater Blvd.
                                          Sugar Land, TX. 77479